706 A.2d 1160

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. SCOTT JOHNSON, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted November 17, 1997—Decided March 9, 1998.

240

Before Judges HAVEY, NEWMAN and COLLESTER.

*Ivelisse Torres*, Public Defender, attorney for defendant-appellant (*Charles H. Landesman*, Designated Counsel, on the brief).

*Peter Verniero*, Attorney General, attorney for plaintiff-respondent (*Bennett Barlyn*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

COLLESTER, J.S.C. (temporarily assigned).

Defendant was convicted following a jury trial of murdering and sexually assaulting Gail Shollar as well as kidnapping her and her three-year-old daughter, A.S., in their vehicle from a supermarket parking lot on November 3, 1992. He received a sentence of life imprisonment with thirty years of parole ineligibility for murder and a consecutive term of 100 years with fifty years of parole ineligibility for the other crimes. He appeals both his conviction and sentence. We affirm.

Defendant makes the following legal arguments on appeal:

POINT I

THE TRIAL COURT ERRED WHEN IT REFUSED TO SUPPRESS INCULPATORY STATEMENTS MADE BY THE DEFENDANT.

A. THE INVESTIGATIVE DETENTION ORDER WAS A SHAM AND CREATED A COERCIVE ENVIRONMENT THEREBY REQUIRING SUBSEQUENT INCULPATORY STATEMENTS MADE BY THE DEFENDANT WHILE IN CUSTODY TO BE SUPPRESSED.

B. DEFENDANT'S STATEMENTS TO JO ANN KEITH IN WHICH HE CONFESSED TO STABBING GAIL SHOLLAR SHOULD HAVE BEEN SUPPRESSED BY THE TRIAL JUDGE BECAUSE SUCH STATEMENTS WERE MADE IN VIOLATION OF DEFENDANT'S *MIRANDA* RIGHTS.

C. STATEMENTS MADE BY THE DEFENDANT TO SERGEANT PAUL OST AND TO OFFICER QUIGLEY SHOULD HAVE BEEN SUPPRESSED.

POINT II

PREJUDICIAL ERROR WAS COMMITTED BY THE TRIAL JUDGE WHEN HE PERMITTED MARK JANSEN TO TESTIFY AS TO THE MEANING OF THE TERM "GET PAID" WHICH WAS SAID TO JANSEN BY THE DEFENDANT IN A CONVERSATION.

POINT III

THE TRIAL JUDGE ERRONEOUSLY CHARGED THE JURY WITH RESPECT TO FIRST AND SECOND DEGREE KIDNAPPING AS TO COUNT EIGHT. THE TRIAL JUDGE'S CHARGE WITH RESPECT TO THE MEANING OF "UNHARMED AND IN A SAFE PLACE" WAS ERRONEOUS.

POINT IV

PLAIN AND PREJUDICIAL ERROR WAS COMMITTED BY THE TRIAL JUDGE WHEN HE DID NOT GIVE A JURY INSTRUCTION ON INTOXICATION.

POINT V

THE TRIAL COURT'S CHARGE WITH RESPECT TO THE DEFENSE OF DIMINISHED CAPACITY WAS ERRONEOUS BECAUSE IT FAILED TO STATE THAT THE DEFENDANT COULD BE ACQUITTED IF THE JURY FOUND THAT THIS DEFENSE WAS PRESENT.

POINT VI

THE DEFENDANT'S OVERALL SENTENCE SHOULD BE VACATED BECAUSE IT VIOLATES THE SENTENCING GUIDELINES SET FORTH IN *State v. Yarbough,* 100 *N.J.* 627, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986).

The State presented the following facts. On Tuesday evening, November 3, 1992, the Shollar family, husband Robert, wife Gail, and three children had dinner together at their Piscataway home. At 7:30 p.m. Gail along with her three-year-old daughter, A.S., left in the family's 1992 Plymouth Voyager minivan to return a videotape of "Beauty and the Beast" to a local video store and do some grocery shopping at the Pathmark Supermarket in the Middlesex County Mall. She never returned to her home again. Computer records show that she rented another video, "All Dogs Go To Heaven," at Quick Video at 7:54 p.m. and completed her shopping at Pathmark at 9:06 p.m.

At about 5:00 p.m. that afternoon, defendant's former girlfriend, Jo Ann Keith, met him in Plainfield and drove him back to her home at 6 Halley Court in Piscataway. At 6:30 p.m. defendant knocked on the door at 17 Water Street, the nearby residence of Mark Jansen and his mother, Barbara. Mark did not personally know defendant although he was familiar with him since he had stolen cars with defendant's brother. Defendant was dressed in dark clothing and appeared to Jansen to be high, wide-eyed and jittery. He asked Jansen if he wanted to steal a car to get money for drugs. Jansen refused, claiming a headache, and defendant told him, "[Y]ou motherfuckers think I'm playing. I'm going to get paid." Jansen construed the remark to mean that defendant was going to get either money or sex. At the end of the five-minute conversation, defendant mumbled something about a mall and walked down Jansen's driveway toward the Middlesex County Mall.

Later that night between 10:00 and 10:10 p.m. Barbara Jansen, Mark's mother, answered a knock on her door. A black man with a goatee and dark clothing whom she did not know was standing under her porch light and asked if her son was home. When she said no, the man left.

Robert Shollar had worked the late shift the night before and fell asleep at about 10:00 p.m. When he awoke at about 2:30 a.m. and found that Gail and A.S. were not home, he called the Piscataway Police Department.

At 6:20 a.m. on Wednesday, November 4, the Piscataway police received a call from Michelle Carnavale, a teacher's assistant at the First Class Day Care Center, saying that a cold and wet little girl had been found on the grounds and that she was crying and would not answer any questions. After the police called Robert Shollar and told him that they had found a little girl matching A.S.'s description, he went to the day care center and identified A.S., who was scared and crying.

On the way to the Piscataway Police Department, A.S. told her father that "a bad man got mommy." She described the man as a black man, wearing black pants and a black shirt with an "X" on it. She then said that the man had a knife and mommy was crying. At the police station A.S. told Ellen Marie Price, a sergeant in the Middlesex County Prosecutor's Office, that outside the supermarket, a black man with a knife had grabbed her mother by the shirt and got into the van. She said that her mother was crying and seemed scared. Her mother drove with the black man who was still there when she was let out of the van.

While A.S. and her father were at police headquarters, Piscataway police responded to a call concerning a suspicious van on Poplar Road at the corner of Water Street near Halley Court. The driver's side window was partially open, and the keys were in the ignition. Lying on the floor was Gail Shollar's driver's license. Bloodstains were observed on the driver's door as well as on the inside carpet and on a plastic bag and a roll of paper towels. Groceries from Pathmark Supermarket were in the cargo area.

John Haley of the Middlesex County Prosecutor's Office Identi-
fication Bureau found a latent print on the sliding door of the
passenger side of the van as well as a print on a paper towel
wrapper in the back of the van. He also retrieved a sanitary
napkin, clothes of Gail and A.S. and a Sports Park coin on the
floor near Gail's purse.

Members of the Piscataway Police Department and the Middle-
sex County Sheriff's Department immediately commenced a
search for Gail Shollar in the vicinity of the recovered van and
canvassed the surrounding neighborhoods for possible witnesses.
That morning the police knocked on Barbara Jansen's door and
asked her whether she had observed anything the night before.
She described the previous night's visitor and told police of finding
blood drippings on a leaf and her outside steps earlier that
morning when letting her pets outside. The officer summoned a
sketch artist from the sheriff's department and prepared a com-
posite sketch with Barbara Jansen of the person she saw the
previous night.

Police also spoke with Mark Jansen who said that he was
uncertain of the identify of the person who had come to his house
the prior night but that he would try to find out. In the course of
other interviews it was determined that defendant had previously
lived at 6 Halley Court with Jo Ann Keith but had moved to
Plainfield.

Also on November 4, Jo Ann Keith spoke with defendant and
told him that there were police in the area of her home because a
stolen van had been found. He replied, "It's probably more than
that." Keith saw a cut on defendant's right index finger and later
went with him to two stores for bandaids and first aid cream.

While trying to locate defendant, the police spoke with Kazim
Kirkland, the live-in boyfriend of defendant's sister, Tamika, who
lived with defendant at 1315 Astor Place in Plainfield. In a
statement he later recanted on cross-examination, Kirkland said
he woke up at 5:30 on November 4, to find defendant cleaning a
large cut on the index finger of his right hand. Kirkland told

police that defendant confided that he had killed a woman he intended to rob after dropping her child off a few blocks from where the killing took place. He also said that defendant told him he wiped down the van and complained that the woman only had a $1.90. He also gave Kirkland a Sports Park token in some change for a coin washer/dryer.

Tamika Johnson overheard defendant talking to Kirkland on November 4, and Kirkland saying, "For real, you did?" She said that after the conversation, Kirkland told her that defendant told him that he had killed the woman. She also said that defendant later told her that "the lady was found in a ditch" and if the police asked about his cut finger, she should tell.them that he cut it washing dishes.

On Friday, November 6, defendant told Jo Ann Keith that he was going to Pennsylvania with a friend. She saw a newspaper sketch of the suspected kidnapper and accused defendant of being responsible. He denied it and told her that he cut his finger in the woods behind a friend's house. Later he told her that Mark Jansen committed the crime.

Piscataway Detective Michael Blair and Detective Charles Clark from the Middlesex County Prosecutor's Office questioned defendant on Friday, November 6 on the street outside of his Plainfield residence. Detective Blair called him by name. When defendant walked to the detectives, Clark extended his right hand to shake hands. Defendant put out his left hand, keeping his right under his jacket pocket. In response to the detective's questions, defendant maintained that he had not visited Piscataway recently because of a problem he had with his girlfriend's daughter. During the conversation, he took his right hand out of his pocket, and both detectives saw a large bandage on his index finger. When Detective Clark asked about it, Johnson said he had cut it while washing dishes several days earlier. The detectives left after defendant declined to accompany them to police headquarters.

The following morning, November 7, 1992, a rescue squad member found the nude body of Gail Shollar partially submerged in several inches of water in a drainage ditch located behind a lumber yard near Jo Ann Keith's house on Halley Court. Numerous wounds were observed on her chest, forearm, neck and face. She was pronounced dead at 11:27 a.m.

The autopsy revealed that Gail Shollar had been stabbed over forty times including a slash wound on her throat with an inch and a half gape down to her spinal cord. The Middlesex County Medical Examiner concluded that the cause of death was hemorrhagic shock and severe trauma to the vital organs caused by multiple and massive stab wounds with an estimated time of death of approximately 10:00 p.m. on November 3, 1992. Further examination by a vaginal smear revealed the presence of intact spermatozoa.[1]

Early that Saturday afternoon Detectives Blair and Clark interviewed Mark Jansen about his visitor on the night of November 3. At this time Jansen said that it was defendant and told of Johnson's comment about "getting paid." The detectives also learned that Barbara Jansen picked out a photograph of defendant as the man she saw standing on her porch the night of the murder.

Armed with this information, Detectives Clark and Blair along with Assistant Prosecutor Thomas Kapsak on the evening of November 7 sought and obtained an order from Superior Court Judge Robert P. Figarotta for investigative detention of defendant to permit full nude body photographs as well as samples of blood, nail scrapings, nail clippings and fingerprints. On their return to Piscataway Police Department at about 8:15 p.m., they were told that a positive match had been made between a set of defendant's inked palm prints on file and the prints found on the victim's van.

---

[1] At trial Robert Shollar testified that he and his wife had not engaged in sexual intercourse for over a week prior to the murder and that his wife was menstruating on November 3, 1992.

They then went searching for defendant and eventually found him at Jo Ann Keith's residence at 6 Halley Court in Piscataway.

Johnson was taken without resistance to the police station at about 9:30 p.m. The order for investigative detention was explained to him, including the fact that the order permitted his detainment for a period not to exceed six hours. No attempt was made to question defendant at that time.

Meanwhile, Jo Ann Keith told police that defendant had one beer and a hit of cocaine about an hour before they arrived that night. She added that she believed the defendant was involved in the murder.

A fresh set of palm prints was taken and positively matched with the prints on the Shollar van. A formal complaint was then prepared charging defendant with the murder and kidnapping of Gail Shollar. The complaint was executed, and the arrest warrant was signed by Judge Figarotta at 11:30 p.m. after Detective Blair made a statement of probable cause under oath.

Shortly before 12:30 a.m. on November 8 Clark told defendant he was under arrest and read him the *Miranda* warnings.[2] Defendant signed the *Miranda* card. He denied involvement with the crime. When he was shown the complaint, he said he did not believe it was real and questioned the judge's signature. Clark left, leaving Blair and Sergeant Lawrence Nagle of the prosecutor's office, in a conference room with defendant.

After Nagle told defendant that Jo Ann Keith believed he was involved in the murder, defendant said he wanted to talk to her. Nagle brought in a telephone from an adjoining room. Defendant did not ask to be alone. When Nagle got her on the phone, he told Keith that defendant wanted to talk to her. She said she did not want to talk to him but agreed after Nagle told her that defendant did not understand why he had been arrested. Blair and Nagle overheard defendant's end of the conversation with

---

[2] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

Keith. At first, defendant denied involvement in the crime, and Keith handed the phone to defendant's aunt. Sergeant Nagle then asked for Keith to be put on the phone again, told her that defendant was "in need of the Lord" and wanted to talk with her. Keith agreed to speak with defendant again, and he then told her, "I stabbed her up. I cut her throat. I had to because she saw me. She could identify me." He then added, "I didn't hurt the little girl. I dropped her off." After the telephone call, Nagle re-advised defendant of his *Miranda* warnings and took a taped statement. During that interview the defendant described in detail his abduction of Gail Shollar and A.S. at the Pathmark on the night of November 3, including the streets on which they travelled. He told the police about dropping A.S. off at a school despite Gail's plea that the child remain with her. While in the van with A.S., defendant claimed that the child was crying and that he had told Gail Shollar to make her stop but that A.S. continued to cry up to the time she was let out of the van. At defendant's direction Gail Shollar then drove the minivan to the location behind Jo Ann Keith's residence near the Stelton Lumber Yard. Defendant said that he opened Gail's pocketbook because she had asked him for a cigarette and that she grabbed him, causing the knife he was carrying to open and cut his right index finger.

Defendant admitted on the taped statement that he had previously said that he had slashed Gail Shollar's throat and had "stabbed her up." He said that at the Stelton Lumber Yard she attempted to run away by opening the van door and that he chased her with his knife as she ran toward the drainage ditch. When he caught her, he told her to be quiet, but she continued to cry out. He claimed that he remembered making stabbing motions with his hand and that the next thing he knew he was lying on top of Gail Shollar's body with the knife in his hand.

Johnson repeatedly denied having sexual intercourse with the victim but was uncertain whether he took off her clothes outside the van. He admitted that he was afraid Gail Shollar could

identify him. After leaving Gail Shollar's body in the ditch, he told of driving the minivan back near Jo Ann Keith's residence on Halley Court where he threw the knife into a wooded area and used his coat and sleeve to wipe away his fingerprints on the steering wheel and door handles.

The taped interview of defendant began at 1:32 a.m. and ended at 2:05 a.m. on November 8. Defendant never requested an attorney.

At about 5:30 a.m. the same day Sergeant Paul Ost of the Piscataway Police Department fingerprinted and photographed the defendant. In the process he had a conversation with defendant. Ost did not re-administer *Miranda* warnings but reminded Johnson of them. According to Ost, the defendant said that he was in a great deal of trouble and might get a lethal injection. Ost responded that he was probably in a little bit less trouble since he had not hurt the child. Defendant indicated that he had a child about that age and he would not hurt kids like that. Ost asked whether "things just got carried away." Defendant said he had been using crack and it was very powerful. He said he just wanted to see if he could get the car, and the next thing he knew, it was murder and kidnapping. He added that the cut on his finger was due to contact with the victim and that his girlfriend knew that he did something on that night since she saw his cut finger.

Officer Quigley, was also in the room, and asked what happened to the knife. Defendant told him that he had thrown it into the brush behind Jo Ann Keith's house at 6 Halley Court. Quigley asked him to make a map of the area, and defendant complied. Later that morning Sergeant Clark went to 6 Halley Court and found a knife shown to be the murder weapon in a neglected area near the house.

Further incriminating statements were made by defendant later that day. When he arrived at the Middlesex County Jail at about 1:00 p.m., he was told by Corrections Officer Robert Hatton that his shoelaces must be removed. Defendant responded, "What do

you need my shoelaces for? I'm not going to kill myself. You all are going to kill me for what I did." Shortly thereafter on his way out of the jail receiving unit, he said, "It's a revolution anyway. You'll be getting a lot like me," and as he was being escorted to the medical unit he yelled, "Kill white women so they can't reproduce." While in the medical room defendant admitted to the duty nurse that he had cut his finger during the crime.

Early the following morning defendant made other statements to change his story. In the early hours of November 9 he told Corrections Officer Michael Buczgniki that he did not know why he was arrested, that he had never seen the van before, that the fingerprints on the van were not his and that the police were trying to set him up. Two days later he told Denise Mento–Bisogno, a bail counselor with Middlesex County Corrections, that he was in the minivan with "white boy Mark," who told him that he had just stabbed someone and asked him to get rid of a knife. Defendant said he cut his palm on the knife before he threw it away at Jo Ann's house. He added that he and Mark then went to Plainfield to buy drugs and that Mark hit a speed bump causing defendant to lunge forward and touch the dashboard. He also claimed that he picked up cigarettes, a driver's license and change and put them into a pocketbook on the floor. When he noticed that his finger was bleeding, he cleaned himself with a paper towel which he found in a grocery bag in the back of the van. He then said that after they purchased drugs Mark dropped him off at Jo Ann's house.

When he spoke again with Mento–Bisogno on November 20, defendant again changed his story. This time he said that Mark had pulled up in the van with a white woman and that the three of them went to buy drugs. Later he left the couple at his girl-friend's house to go buy something to drink. When he returned, he heard a woman screaming and went into the woods to investi-gate. He found Mark stabbing the woman. When he tried to intervene, Mark cut him with the knife and then threw the woman into a ditch. During this narrative defendant identified Mark by

three last names: Gaston, Baskin and Jansen. At no point did he mention a child was present.

In addition to the overwhelming factual testimony of defendant's guilt, the State also introduced strong forensic evidence. Michael Vick, a FBI special agent testified as an expert in DNA analysis. He explained that there are four probes to match for a positive identification when analyzing DNA and that the semen stains found on the paper towels in the Shollar minivan and the blood taken from the outside driver's door had a three-probe match with defendant with one probe being uninterpretable. He calculated that the likelihood of another person having a three-prong match was 1 in 5,900. He also testified that a sample of an unknown substance taken from the outside of the van and a sample from the back seat of the van each had a two-prong match, which indicated a 1 in 232 chance that the DNA was from someone else. Finally, Vick found that the vaginal swab contained a one point match with defendant, meaning that there was a 1 in 6 chance that it was not from defendant, but semen found on another paper towel in the minivan had a two-prong match.

Robert Spalding, also a special agent for the FBI, was qualified as an expert in forensic serology. He testified that blood matching that of the defendant was recovered from the outside door of the Shollar minivan van as well as on various items within the minivan and on leaves outside the Jansen residence at 17 Water Street in Piscataway. Moreover, a black, blue and orange jacket belonging to defendant had both defendant's blood and the victim's blood on it. The heel impressions on defendant's coat matched defendant's Nike sneaker. Though there was also blood on the knife, there was not enough for comparison.

The factual testimony for the defense was brief. Mark Baskin, defendant's brother, testified that he knew Mark Jansen and had purchased liquor with him on the weekend of November 3, 1992 when Jansen showed him a butterfly knife that looked like the murder weapon.

Victoria Baskin, defendant's aunt, testified as to defendant's troubled childhood, recalling hospital visits for seizures and severe physical abuse of defendant by his father.

Tamika Johnson, defendant's half-sister, testified that the defendant acted "spaced out" when under the influence of drugs and that he suffered physical abuse as a child. On cross-examination she said that defendant had admitted to others that he committed the murder.

The remaining defense witnesses raised the issue of defendant's alleged diminished capacity. Frederick Rotgers, a clinical psychologist and assistant research professor at the Rutgers University Center for Alcohol Studies, met with defendant on four occasions and performed neuropsychological, personality and intelligence testing. Rotgers said that defendant first gave a "delusional" account of the offense in which he admitted presence at the scene but denied wrongdoing. After a later meeting at which defendant gave another account more compatible with the police reports, Rotgers concluded that defendant had "tremendous difficulty" accepting that he committed the crimes.

Rotgers related a history of significant medical problems early in defendant's life, including pneumonia and seizures. A Bureau of Children's Services report related that he had been abused, burned with cigarettes, and hung by his neck with a rope. This abuse resulted in brain impairment according to Rotgers. He further related defendant's self-described blackouts and hearing of voices. He opined that defendant had "intermittent explosive disorder," whereby he suddenly lost control or became aggressive and was unable to recall what occurred. Additionally, Rotgers took a history of substance abuse including the defendant's use of marijuana dating back to age five and his subsequent use of crack and heroin, and alcohol throughout his life. He indicated that Mark Jansen's description of the defendant on the night of the crimes as jittery, wide-eyed and appearing high was consistent with a person on crack.

Rotgers diagnosed defendant with "delusional disorder of the persecutory type," "intermittent explosive disorder," substance abuse and "paranoid personality disorder with antisocial and passive/aggressive traits." He said that defendant showed signs of intoxication and early cocaine withdrawal and speculated that therefore his primary reason for the car-jacking was to obtain money for drugs. An "overwhelming rush" of situations then occurred to which defendant had to respond but was unable to do so appropriately because his low intelligence and neurological problems were such that he could not rationally react to complex situations even in the best of circumstances. His cognitive judgment and behavior controls were severely impaired by a combination of intellectual inadequacy, neurological dysfunction, alcohol intoxication, residual cocaine intoxication and emotional disturbances which resulted in a delusional disorder and possibly major depression. Rotgers concluded that these factors "severely diminished" defendant's ability to purposely and knowingly carry out the murder and sexual assault of Gail Shollar, and his behavior was no longer under his voluntary control after he released A.S.

In further support of defendant's diminished capacity theory, Jonathan Willard–Mack, an expert in neuropsychology, testified that after he met with defendant four times and reviewed childhood hospital and school records, he determined that defendant suffered from a brain dysfunction caused by physical and verbal abuse, discord, stress and lack of nurturance and impaired perceptual processing, which in turn inhibited his responses. He also found that defendant suffered from dissociative disorder and organic personality disorder. Based on this brain damage as well as assumed intoxication, cocaine withdrawal and severe psychological stress of the incident, defendant did not know what he was doing when he murdered Gail Shollar in Dr. Willard–Mack's opinion.

In rebuttal to the defense testimony, the State called Dr. Robert Sadoff, an expert in forensic psychiatry, who began his testimony by relating the history obtained from defendant. Regarding the

criminal intent, Johnson told Dr. Sadoff initially that he went to Mark Jansen's house where Jansen asked him if he wanted to "get paid." He went on to say that Jansen committed the crime and that he cut his finger trying to stop him. However, in the second interview defendant changed his story and said that he alone committed the murder and recalled all the events leading up to it including the car-jacking and releasing the child but then "blacked out," later finding himself on top of the victim with a bloody knife in his hand.

Dr. Sadoff found no evidence of organic brain syndrome or brain damage. He said that it was "highly unusual" for a person to have a good memory for some parts of a story, then to black out as to the remainder. He concluded that defendant knew what he was doing at the time of the crimes, he knew that it was wrong and did not have any mental illness which deprived him of the ability to act knowingly and purposely throughout each step of the incident including the sexual assault and murder.

On February 24, 1995 the jury found the defendant guilty of all counts charged in the indictment. The matter proceeded to the penalty phase on the charges of capital murder, and on March 3, 1995 the jury was discharged after reporting it was unable to reach a unanimous verdict. Thereafter, on May 8, 1995 the defendant was sentenced to an aggregate sentence of life imprisonment plus one hundred years with a parole ineligibility term of eighty years. We address each point of defendant's appeal in the order raised.

## I. THE EFFECT OF THE INVESTIGATIVE DETENTION ON SUBSEQUENT STATEMENTS BY DEFENDANT.

Defendant argues that the trial court erred in denying his application to suppress statements made by him to law enforcement officers on the night of November 7 and morning of November 8. He contends that the investigative detention order obtained on November 7 was a "sham" and created a "coercive environment" which tainted his statements made to Jo Ann Keith in the

presence of Detectives Nagle and Blair as well as his subsequent formal taped statement and his admissions to Sergeant Ost.

*R.* 3:5A–1 permits the State to obtain an order compelling a suspect in a criminal case to submit to identification procedures to obtain nontestimonial evidence of physical characteristics under circumstances set forth in *State v. Hall,* 93 *N.J.* 552, 562, 461 *A.2d* 1155 (1983), *cert. denied,* 464 *U.S.* 1008, 104 *S.Ct.* 526, 78 *L.Ed.2d* 709 (1983) as follows:

[A] court's authorization of an investigatory detention must, first, be based upon sufficient evidence to demonstrate that a particular crime has occurred, that the crime is unsolved and that it is under active investigation. Second, the police must demonstrate a reasonable and well-grounded basis to believe that the individual sought as the subject of the investigative detention may have committed the crime under investigation. Additionally, it must be shown that the results of the detention will significantly advance the criminal investigation and will serve to determine whether or not the subject probably committed the crime. Further, it must also appear that these investigative results cannot otherwise practicably be obtained.

■ Defendant underscores that while the stated purpose of the investigative detention order was to take photographs, finger prints, palm prints, fingernail scraping and clippings and blood samples, the police already had his fingerprints and did not try to obtain all of the exemplars or other matters permitted by the order prior to the subsequent issuance of the criminal complaint. He therefore contends that the order was not intended to advance the criminal investigation but was a subterfuge to take him into custody and hold him until an arrest warrant could be obtained, conduct proscribed by *R.* 3:5A and *State v. Rolle,* 265 *N.J.Super.* 482, 627 *A.2d* 1157 (App.Div.), *certif. denied* 134 *N.J.* 562, 636 *A.2d* 520 (1993). We hold that there was no violation of *R.* 3:5A and that *Rolle* is factually distinguishable.

In *Rolle* the order provided that defendant was to be detained for a period not to exceed five hours for photographs and finger-printing. He was taken into custody, given *Miranda* warnings and interrogated for about three hours. He was finally finger-printed and photographed after about five hours in custody, and only after he had given a taped confession. We determined that

the State misconceived the function and scope of the rule permitting investigative detention and suppressed the defendant's inculpatory statement, asserting that

[I]nvestigative detention orders may be used only to compel a defendant "to submit to non-testimonial identification procedures for the purpose of obtaining evidence of his or her physical characteristics . . ." Police investigatory procedures undertaken pursuant to the authority of an investigative detention order which exceed this narrow scope are not only illegally unwarranted but also abuse a closely demarcated process designed for limited salutary purposes. Evidence obtained as a result of such conduct must be suppressed.

*Id.* at 488, 627 *A.*2d 1157.

The factual setting herein is in drastic contrast to *Rolle.* At the hearing on the issue the State produced numerous witnesses, all of whom were deemed by the motion judge to be "exceptionally credible," a finding we determine was based upon sufficient credible evidence present in the record. *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964). Notably, the defense produced no witnesses.

Assistant Prosecutor Kapsak testified that in the early evening of November 7 when he sought the investigatory order, he was aware that the victim had been stabbed and that defendant had been seen with a cut on his finger. Four days had passed since the murder, and Kapsak was concerned that the cut would heal and that potential evidence would be irretrievably lost. He also wanted blood samples to compare against the numerous bloodstains in the van and on the Jansen's doorstep. Moreover, while Investigator O'Brien, the fingerprint expert, had a set of defendant's palm prints taken at the time of a prior arrest, he wanted a better match to compare against the palm print found on the Shollar van.

When Kapsak, Blair and Clark returned to headquarters after obtaining the order at 7:30 p.m., they learned that Investigator O'Brien had matched defendant's palm prints to the print lifted off of the victim's van. Blair and Clark went to defendant's home address in Plainfield to apprehend him on the investigatory detention order. Unable to find him they spoke to his sister, Tamika,

and Kazim Kirkland, with Kirkland indicating that defendant told him he had "offed" someone.

At about 9:40 p.m., after defendant was taken into custody, Jo Ann Keith told Detective Nagle that she believed that defendant was involved. At police headquarters palm and finger prints were taken as well as photographs of defendant and his cut hand. At 10:15 p.m., O'Brien concluded that defendant's newly inked prints matched those found on the Shollar van. Armed with this additional information obtained since the execution of the investigatory detention order, Kapsak decided at 10:30 p.m. to prepare a complaint charging defendant with the murder and kidnapping of Gail Shollar. At 11:00 p.m., Blair and Kapsak drove to the judge's residence for the issuance of the complaint and arrest warrant, which was obtained at 11:30 p.m. and served on defendant an hour later. During the time from his apprehension on the investigative detention order to his formal arrest defendant was not questioned.

Given the state of Kapsak's knowledge in the early evening of November 7, there was sufficient evidence to support the motion court's conclusion that investigative detention was warranted and the order obtained in good faith. The rapid unfolding of events including the palm print match as well as the statements of Kirkland and Keith justified the change in position from investigative detention to arrest which in turn superseded and obviated the need for investigative detention since the investigative items could be, and were in fact, properly obtained after arrest. There is no evidence of overreaching or improper use by the State of the permitted procedure of R. 3:5A, and the record is barren of any form of coercion requiring the suppression of statements subsequently made by defendant.

## II.  THE ADMISSIBILITY OF DEFENDANT'S STATEMENTS.

Defendant was placed under arrest and advised of his *Miranda* rights at 12:29 a.m. on November 8, 1992. He denied his involvement in the Shollar murder. However, he asked to speak

on the phone with Jo˙ Ann Keith after Detective Nagle told him that Keith had said she thought he was involved in the crime. Nagle placed the call to Keith without ever discussing with her what she should say to defendant. Defendant spoke with Keith at about 1:10 a.m. with the two detectives in the room with him and able to hear his side of the conversation. Defendant did not ask for privacy, nor was he given the opportunity. The call lasted about thirty minutes including the time during which Nagle convinced Keith to continue talking to defendant.

After his incriminating statements in the phone conversation, defendant was again given *Miranda* warnings prior to a formal sworn and taped statement. At no point after his arrest did he invoke his right of silence or right to counsel.

Defendant argues that the State did not meet its burden of proving the voluntariness of his incriminating statements beyond a reasonable doubt. *State v. Kelly,* 61 *N.J.* 283, 294, 294 *A.*2d 41 (1972). In making this determination we consider the totality of the circumstances including "... the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated or prolonged in nature, and whether physical punishment and mental exhaustion were involved." *State v. Galloway,* 133 *N.J.* 631, 654, 628 *A.*2d 735 (1993). The determination of whether a confession is the product of "rational intellect" and "free will" is necessarily fact-sensitive, involving analysis of all factors bearing on the defendant's condition at the time. *State v. Burris,* 145 *N.J.* 509, 534, 679 *A.*2d 121 (1996).

The evidence adduced at the admissibility hearing indicates that defendant's education ended with the seventh grade and that at some time prior to being taken into custody on the investigative detention order he took a "hit" or two of cocaine from a matchstick and consumed one or two beers. However, there was no testimony or indication from defendant's lack of formal education or his modest use of intoxicating substances that there was any

negative impact on his ability to understand and waive his Constitutional rights and voluntarily confess to the crimes charged.

There is not a scintilla of evidence indicating improper treatment or prolonged and improper questioning. Defendant was not questioned at all for the approximate two and one half hours he was in police custody pursuant to the investigative detention order. The actual questioning began at about 12:30 a.m. and ended at approximately 2:00 a.m., and the taped statement did not indicate mistreatment or abusive police conduct. Defendant was not confined to a cell but was unmanacled in a conference room. He was offered and declined food and drink. Moreover, at age twenty-three he had a prior criminal record and was familiar with police investigations. *Id.* at 527, 679 *A.*2d 121; *State v. Puchalski*, 45 *N.J.* 97, 101, 211 *A.*2d 370 (1965).

■ Defendant argues that Sergeant Nagle deliberately used defendant's thirty-nine year old former girlfriend, Jo Ann Keith, during the interrogation in a coercive manner that impaired defendant's exercise of free will and resulted in the confession to her in the presence of the detectives. However, there is no proof that the officers recruited Keith to their cause or instructed her as to what to say to get defendant to confess to the crimes. On the contrary, it was at defendant's request that the phone conversation was initiated, and his incriminating statements were made without prompting by either the detectives or Keith. Furthermore, even if the officers used Keith to assist in their investigation, that fact in and of itself would not render defendant's confession involuntary. Given the natural reluctance of a suspect to admit guilt, interrogating officers are given leeway in their efforts to dispel that reluctance and obtain a statement. *Colorado v. Connelly*, 479 *U.S.* 157, 164, 107 *S.Ct.* 515, 520, 93 *L.Ed.*2d 473, 482 (1986); *Galloway, supra*, 133 *N.J.* at 654–55, 628 *A.*2d 735; *State v. Miller*, 76 *N.J.* 392, 402, 388 *A.*2d 218 (1978); *State v. Smith*, 32 *N.J.* 501, 550, 161 *A.*2d 520 (1960), *cert. denied*, 364 *U.S.* 936, 81 *S.Ct.* 383, 5 *L.Ed.*2d 367 (1961).

There is no indication that the police conduct constituted such substantial psychological pressure as to overbear the will of defendant or in any way affected the voluntariness of his statement. *Galloway, supra,* 133 *N.J.* at 656, 628 *A.*2d 735; *Miller, supra,* 76 *N.J.* at 405, 388 *A.*2d 218. To the contrary, there was substantial, credible evidence adduced to support the determination of the motion judge that the State proved beyond a reasonable doubt that defendant was advised of his *Miranda* warnings, that he made a knowing and intelligent waiver and that he voluntarily and knowingly made his incriminating statements both on the phone to Keith in the presence of the detectives and in his later formal, taped statement to the officers. *State v. Hartley,* 103 *N.J.* 252, 262–63, 511 *A.*2d 80 (1986); *Kelly, supra,* 61 *N.J.* at 294, 294 *A.*2d 41; *Johnson, supra,* 42 *N.J.* at 162, 199 *A.*2d 809; *State v. Godfrey,* 131 *N.J.Super.* 168, 174, 329 *A.*2d 75 (App.Div.1974), *aff'd,* 67 *N.J.* 267, 337 *A.*2d 371 (1975). Therefore, there was no error in the admission of these statements of defendant at his trial.

■ Similarly, there was no error in the admission of defendant's incriminating statements made to Sergeant Ost and Officer Quigley in the course of his being photographed on the morning of November 8. By this time defendant had twice received *Miranda* warnings, and Ost further reminded defendant that he was under no obligation to talk to him. Based on the testimony at the admissibility hearing there was substantial, credible evidence to support the ruling admitting these statements. *Johnson, supra,* 42 *N.J.* at 162, 199 *A.*2d 809; *Godfrey, supra,* 131 *N.J.Super.* at 174, 329 *A.*2d 75.

### III. MARK JANSEN'S TESTIMONY.

Mark Jansen testified at the trial that on the early evening of November 3, 1992, defendant knocked on his door and inquired whether Jansen would be interested in stealing a car with him. when Jansen declined, defendant told him: "[Y]ou motherfuckers think I'm playing. I'm going to get paid." The defense objected

when the prosecutor asked Jansen to explain his understanding of the expression "get paid," and the court properly required the prosecutor to give a foundation prior to admitting the testimony. Jansen testified that although he had never previously heard defendant use the phrase, he had heard it used by both white and black contemporaries on the streets in Piscataway and by other inmates when he was in jail as a common expression to mean getting money or sex.

▪ Defendant asserts error in the admission of the testimony since Jansen could not testify as to defendant's meaning of the phrase but only his own interpretation. A witness may not testify to a matter unless there is a showing of personal knowledge. *N.J.R.E.* 602; *State v. LaBrutto,* 114 *N.J.* 187, 197, 553 *A.*2d 335 (1989). However, we are satisfied that the testimony was admissible as lay witness opinion under *N.J.R.E.* 701:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.

The trial court correctly found that Jansen's knowledge of the term "get paid" was based on his having heard the term on the streets of Piscataway and in prison and properly confined the testimony to Jansen's understanding as opposed to speculation about defendant's knowledge of the phrase. Moreover, since "get paid" was a slang term unfamiliar to the average juror, Jansen's lay opinion testimony was of assistance in determining the meaning and context of his conversation with defendant and was obviously relevant to the issue of defendant's motive and intention. *See United States v. Delpit,* 94 *F.*3d 1134, 1145 (8th Cir.1996) ("[t]here is no more reason to expect unassisted jurors to understand cryptic slang than antitrust theory or asbestosis"); *United States v. Lowe,* 9 *F.*3d 43, 47 (8th Cir.1993), *cert. denied,* 510 *U.S.* 1181, 114 *S.Ct.* 1229, 127 *L.Ed.*2d 573 (1994); *United States v. Garcia,* 994 *F.*2d 1499, 1506–07 (10th Cir.1993).

Furthermore, we take note of the fact that while testifying as a rebuttal witness on the issue of diminished capacity, Dr. Sadoff

testified that in his initial interview defendant said that Jansen had approached him on November 3, 1994 and asked defendant if he wanted to "get paid." Defendant then explained to Dr. Sadoff that "get paid" meant getting money by robbery. Therefore, the danger of any improper inference from Jansen's testimony was rendered nugatory.

Admission of Jansen's testimony did not constitute an abuse of discretion by the trial court.

## IV. THE COURT'S CHARGE AS TO THE KIDNAPPING OF A.S.

The eighth count of the indictment charged the defendant with first degree kidnapping of the child, A.S. In the jury instructions on this count the court said,

> Kidnapping is a crime of the first degree except that it is a crime of the second degree if the kidnapper releases the victim unharmed and in a safe place.

> In order to find the defendant guilty of kidnapping in the first degree, the State must prove either of the following beyond a reasonable doubt: That the defendant did not release the victim you're considering unharmed or that the defendant did not release the victim you are considering in a safe place. In other words, if the State has proven either one of those to your satisfaction beyond a reasonable doubt, then he's guilty of kidnapping in the first degree.

> If they have not proven either one of those to your satisfaction, actually if they fail to prove either one of them beyond a reasonable doubt, then you have to find him guilty of kidnapping in the second degree.

After the jurors began deliberations, they asked for a definition of emotional harm and safe place. The judge charged as follows:

> All right, with regard to safe place, you have asked for the definition of "safe place." In my previous instruction I did not define that term. There is no statutory definition of safe place. The decision of whether the person was released in a safe place is a factual determination for the jury to make.

> In making the decision, consider all of the evidence in the case and decide whether under the totality of the circumstances a reasonable person would consider where the victim was reason [sic] to be a safe place. In other words, under the totality of the circumstances, was this an objectively safe place to release this particular victim, [A.S.], when she was released.

> You have heard testimony about where, when, and under what circumstances [A.S.] was released as well as her age. These are but some of the circumstances you may consider. You should consider all of the circumstances.

When the jury returned its verdict and responded to the special interrogatories, ten of the jury members determined that A.S. was harmed while two found she was not harmed. However, the jury was unanimous in finding that A.S. was not released to a safe place. Defendant was therefore convicted of first degree kidnapping of A.S.

Defendant argues that the court's supplemental instruction did not set forth an adequate definition of "safe place" and improperly singled out A.S.'s age as a factor for consideration. We disagree.

The court correctly charged that to obtain a conviction for first degree kidnapping the State bears the burden of proving beyond a reasonable doubt that either the defendant did not release the victim unharmed prior to his apprehension or that he did not release the victim in a safe place prior to his apprehension. *State v. Federico*, 103 *N.J.* 169, 176, 510 *A.2d* 1147 (1986); *State v. Smith*, 279 *N.J.Super.* 131, 140–41, 652 *A.2d* 241 (App.Div.1995). If the defendant is found guilty of kidnapping and the State fails to prove one of those two factors, then the defendant is guilty of second degree kidnapping. *N.J.S.A.* 2C:13–1c.

The trial court's supplemental instruction noted the fact-sensitive nature of the jury function and stressed the necessity of examining the totality of circumstances including where, when and under what conditions A.S. was released and her age. The reference to the victim's age as one factor for consideration was entirely appropriate in the instant case since common sense indicates that a place that might be "safe" for an adult may be precarious, unhealthy or dangerous for a small child. *See Thornburg v. State*, 699 *S.W.2d* 918, 921 (Tex.Ct.App.1985). Indeed, the jury could and did properly find that separating an upset, crying three year old child from her distraught mother and leaving her near the bushes of a closed day care center after 9 p.m. on a rainy November night hardly constitutes leaving her in a "safe place." Both the initial and supplemental instructions of the issue were manifestly proper. *State v. Brown*, 46 *N.J.* 96, 101, 215 *A.2d* 9 (1965).

## V.  THE DEFENSE OF INTOXICATION.

Defendant argues for the first time on appeal that the trial judge erred in failing to instruct the jury *sua sponte* on the defense of voluntary intoxication as per *N.J.S.A.* 2C:2–8. Since defendant did not request a charge on intoxication and did not object to its omission from the jury instructions, he can prevail only upon a demonstration of plain error, *viz,* error "clearly capable of producing an unjust result." *R.* 2:10–2. *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997) (citing *State v. Hock,* 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969), *cert. denied,* 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970)).  Our careful review of the trial record satisfies us that defendant fails to demonstrate any error, plain or otherwise.

Voluntary intoxication is not a valid defense unless it negates an element of the offense. *State v. Cameron,* 104 *N.J.* 42, 51, 514 *A.*2d 1302 (1986); *State v. Bauman,* 298 *N.J.Super.* 176, 194, 689 *A.*2d 173 (App.Div.) *certif. denied,* 150 *N.J.* 25, 695 *A.*2d 668 (1997).  The intoxication must be of an "extremely high level," *Cameron, supra,* 104 *N.J.* at 54, 514 *A.*2d 1302; *State v. Sette,* 259 *N.J.Super.* 156, 170, 611 *A.*2d 1129 (App.Div.), *certif. denied* 130 *N.J.* 597, 617 *A.*2d 1219 (1992).  A jury instruction is mandated only when the facts "clearly indicate" a rational basis that the defendant suffered from a "prostration of faculties" to render him incapable of forming the requisite mental state to commit the crime. *State v. Mauricio,* 117 *N.J.* 402, 418–19, 568 *A.*2d 879 (1990); *Cameron, supra,* 104 *N.J.* at 54, 514 *A.*2d 1302; *State v. Choice,* 98 *N.J.* 295, 299, 486 *A.*2d 833 (1985); *State v. Powell,* 84 *N.J.* 305, 318–19, 419 *A.*2d 406 (1980).  Among the factors pertinent to this issue are included the quantity of intoxicant consumed, the period of time involved, the defendant's ability to recall significant events and his conduct as perceived by others. *Id.* at 56, 514 *A.*2d 1302.

Three witnesses gave direct evidence which could conceivably relate to defendant's condition prior to the abduction and

murder. Jo Ann Keith testified that she had seen defendant in the past when he was "stoned" or high on drugs but that he did not seem high on the afternoon of November 3. Mark Jansen saw defendant at 6:30 that evening and said that defendant appeared high with wide open eyes that never blinked, but Jansen had no prior personal knowledge of the defendant before that evening. Lastly, Keith Darren Moore testified that he met defendant on the street in the early evening of November 3 and that he seemed "a little excitable" when he asked Moore for a cigarette and a sip of wine. Even accepting this testimony in its entirety does not constitute an adequate basis for a jury charge on voluntary intoxication. *See, e.g., Mauricio, supra,* 117 *N.J.* at 419–20, 568 *A.*2d 879; *Bauman, supra,* 298 *N.J.Super.* at 195–96, 689 *A.*2d 173.

Defendant's argument also relies on the testimony of Dr. Rotgers who related defendant's statements to him that on the day of the murder he began using drugs and drinking at about 3:00 p.m., and then smoked three vials of crack cocaine and drank six miniature bottles of hard liquor after visiting his daughter. Defendant further told Rotgers that after returning to Piscataway with Jo Ann Keith, he bought and smoked two ten-dollar vials of crack and later drank two or three swallows of fortified wine with a friend at about 9:00 p.m.

Accepting these statements of defendant, Rotgers said that he believed that he was "to some extent intoxicated on alcohol" when he committed his crimes, even hypothesizing a blood alcohol content of about 0.2%. However, Rotgers also testified that defendant was not so intoxicated that he could not form a purposeful and knowing intention to commit the abduction and other crimes. Therefore, even the uncorroborated hearsay statements of defendant were inadequate for an expert opinion consistent with the legal standard for voluntary intoxication.

The absence of any meaningful expert opinion or reliable observations of intoxication is in marked contrast to defendant's detailed recollection of events prior, during and subsequent to his

crimes as detailed in his numerous statements. We conclude that there was no factual or legal basis for a jury instruction of voluntary intoxication and certainly no error capable of producing an unjust result from the lack of such an instruction. *See State v. Micheliche,* 220 *N.J.Super.* 532, 543, 533 *A.*2d 41 (App.Div.), *certif. denied,* 109 *N.J.* 40, 532 *A.*2d 1108 (1987); *State v. Ghaul,* 132 *N.J.Super.* 438, 441, 334 *A.*2d 65 (App.Div.1975).

## VI. THE CHARGE ON DIMINISHED CAPACITY.

Defendant argues for the first time on appeal that the trial court committed plain error in the jury instructions concerning the defense of diminished capacity. Specifically, defendant alleges that the court erred in failing to advise the jury (1) that if he was found to have a mental disease or defect, he had to be acquitted and (2) that if by virtue of a mental defect he did not purposely or knowingly kill, then the jury should consider aggravated manslaughter.

Diminished capacity as codified by *N.J.S.A.* 2C:4–2, is not an affirmative defense that justifies or excuses conduct otherwise criminal but rather serves to negate the *mens rea* element of the crime charged. *State v. Reyes,* 140 *N.J.* 344, 354, 658 *A.*2d 1218 (1995). It permits the introduction of evidence which is relevant to the question of whether the State has proven the required mental state beyond a reasonable doubt. *State v. Breakiron,* 108 *N.J.* 591, 612–13, 532 *A.*2d 199 (1987). The trial judge is obliged to instruct the jury to consider relevant evidence tending to show that the defendant did not have the requisite state of mind to commit the offense charged. *State v. Ramseur,* 106 *N.J.* 123, 268, 524 *A.*2d 188 (1987).

Judge Hoffman charged the jury in pertinent part as follows:

Now, as to certain counts, evidence has been produced alleging that defendant suffered from a mental disease or defect. You may consider that evidence in determining whether or not the State has proven beyond a reasonable doubt the mental states required for those counts.

.... More specifically, you may consider this evidence of mental disease or defect on the State's obligation to prove purposeful or knowing conduct with respect to the murder charge in Count 1 and whether defendant purposely or knowingly caused death. You may also consider such evidence with regard to the State's obligation to prove purposeful conduct regarding Count 9 of aggravated sexual assault. And since aggravated sexual assault is the predicate crime in Count 5, you may also consider such evidence as to that count.

### After reviewing the role of experts, the judge charged:

So to summarize, evidence that the defendant suffered from a mental disease or defect has been produced as to certain counts. You may consider that evidence in determining whether or not the State has proven beyond a reasonable doubt the mental state required for that particular charge. In other words, the State must prove beyond a reasonable doubt that the defendant acted with the required mental states of purposely or knowingly as to the murder and purposely as to the aggravated sexual assault and sexual assault despite any mental disease or defect.

### The judge later reiterated:

Evidence alleging that the defendant suffered from a mental disease or defect has been produced. You may consider that evidence in determining whether the State has proved beyond a reasonable doubt that the defendant had the mental state of purposely or knowingly with regard to the murder ... with regard to aggravated sexual assault and sexual assault.

We determine that Judge Hoffman fully and adequately instructed the jury as to the concept of diminished capacity.

Similarly, defendant's contention that the court did not advise the jury that it should consider aggravated manslaughter if defendant was acquitted of murder on a diminished capacity basis is equally without merit. Judge Hoffman properly charged the elements of murder and told the jury that should they find defendant not guilty of murder they were then to consider the lesser included charge of aggravated manslaughter, and he went on to instruct all the elements of manslaughter. Moreover, in reviewing the verdict form with the jury the court took pains to explain that they were to consider the aggravated manslaughter if and only if they found the defendant not guilty of murder.

There was no error in the charge.

### VII. DEFENDANT'S SENTENCE.

After the defendant's conviction for capital murder of Gail Shollar, the jury was unable to reach a unanimous verdict on the

imposition of the death penalty. Therefore, sentence was imposed on defendant by Judge Hoffman for the mandatory term of life imprisonment with a thirty-year period of parole ineligibility. In addition, the judge sentenced defendant as follows: thirty years with fifteen years parole ineligibility for the kidnapping of Gail Shollar to run consecutive to his sentence for murder; another consecutive sentence of thirty years with fifteen years parole ineligibility for the kidnapping of A.S.; twenty years consecutive with a ten-year parole ineligibility period for aggravated sexual assault of Gail Shollar; and an additional consecutive term of twenty years with ten years parole ineligibility for the robbery of the Shollar minivan. The remaining counts of the indictment were merged for the purpose of sentence. The aggregate sentence was therefore life imprisonment plus 100 years to run consecutive with a total parole ineligibility of eighty years. Defendant contends his sentence was excessive and must be vacated.

In the reasons for sentence Judge Hoffman found specific aggravating factors for each count and a total absence of mitigating factors. He noted the number of crimes committed, the fact that there was more than one victim and the extent of viciousness in cruelty in the rape and murder of Gail Shollar. He also considered the incalculable suffering of the Shollar family and the toll that these heinous and notorious crimes had taken on their sense of well-being and security of the community at large. As a result his expressed intention was that defendant receive "a true life sentence."

An appellate court should not alter the sentencing of a trial court except in circumstances where there is a clear showing of error that "shocks the judicial conscience." *State v. Roth*, 95 *N.J.* 334, 364–65, 471 *A.*2d 370 (1984). In this case Judge Hoffman conformed to applicable sentencing guidelines, finding and applying aggravating factors amply that were supported by the record and gave extensive reasons for his sentence. *State v. Roach*, 146 *N.J.* 208, 230, 680 *A.*2d 634 (1996), *cert. denied*, —— *U.S.* ——, 117 *S.Ct.* 540, 136 *L.Ed.*2d 424 (1996); *State v. O'Don-*

*nell,* 117 *N.J.* 210, 215–16, 564 *A.*2d 1202 (1989); *State v. Kruse,* 105 *N.J.* 354, 358–63, 521 *A.*2d 836 (1987).

We find also that the sentencing judge followed proper procedures and standards in the imposition of consecutive as opposed to concurrent sentences for defendant's crimes. *N.J.S.A.* 2C:44–5a. Consecutive sentences do not constitute an abuse of discretion where there are separate acts of violence and separate victims. *State v. Louis,* 117 *N.J.* 250, 254–55, 566 *A.*2d 511 (1989); *State v. Yarbough,* 100 *N.J.* 627, 643, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986). Defendant argues that the crimes for which he was sentenced were committed at the same time and place so as to indicate a short period of aberrant behavior and militate for a concurrent sentence. *Id.* at 643–44, 498 *A.*2d 1239. We find instead that the crimes and objectives were predominantly independent of each other so as to justify consecutive sentences.

The record substantiates that defendant's original objective was robbery to obtain money for purchase of drugs. The criminal objective could have been realized without the carjacking and kidnapping of Gail and A.S.. The subsequent, violent sexual assault of Gail Shollar was not a natural progression of the robbery, and her vicious murder was by defendant's admission motivated by his desire to avoid identification and apprehension. Moreover, all of these crimes took place over an hour and in different places throughout the town of Piscataway.

There can be no free crimes, and separate crimes ordinarily deserve separate punishment. *Ibid.; Roach, supra,* 146 *N.J.* at 230–31, 680 *A.*2d 634; *State v. Sutton,* 132 *N.J.* 471, 485, 625 *A.*2d 1132 (1993); *State v. Rogers,* 124 *N.J.* 113, 119, 590 *A.*2d 234 (1991). However, consecutive sentences must be informed by proper judicial discretion as well as fairness. *Sutton, supra,* 132 *N.J.* at 485, 625 *A.*2d 1132.

We find that in the sordid factual context of this case in which separate victims suffered separate and distinct harm culminating

in a vicious murder that the sentencing judge properly exercised judicial discretion in imposing consecutive sentences.

Defendant next contends that the sentencing judge violated the outer limits on the cumulation of consecutive sentences which was set forth in *Yarbough* as follows:

> [T]here should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term if eligible) that could be imposed for the two most serious offenses.
>
> *Yarbough, supra,* 100 *N.J.* at 644, 498 *A.*2d 1239.[3]

Judge Hoffman acknowledged his deviation from the guideline, noting that *Yarbough* permitted such a departure in extreme and extraordinary cases. *Id.* at 647, 498 *A.*2d 1239. We agree that a severe, extraordinary sentence was justified in this egregious case and find no abuse of discretion in the sentence imposed.

Affirmed.

---

[3] The overall outer limit on the cumulation of consecutive sentences was abolished by *N.J.S.A.* 2C:44–5(a), effective August 5, 1993. However, since these crimes occurred in November, 1992, the *Yarbough* guideline is applicable to the instant case.