SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Amrit Singh (A-37-19) (083236)**

**Argued September 29, 2020 -- Decided January 21, 2021**

**FERNANDEZ-VINA, J., writing for the Court.**

The Court considers whether a detective's testimony at the trial of defendant Amrit Singh requires reversal of defendant's convictions. Specifically, the Court considers whether it was plain error for the trial court to allow the detective to make two references to "the defendant" in narrating the surveillance footage of a robbery for the jury and whether the detective's testimony concerning defendant's sneakers violated N.J.R.E. 701, when the sneakers and the video were both admitted into evidence.

In January 2015, a man entered a gas station store wielding a machete and told the cashier to give him the money. The man took the money and fled. The cashier described the man as wearing dark clothes and gloves. The events were captured on the gas station's surveillance video, which police retrieved that night.

Officers dispatched to the scene noticed and chased an individual in dark clothing. After losing sight of the suspect, one of the officers found an individual -- later identified as defendant -- wearing dark clothing, sweating, and breathing heavily in a nearby backyard. Defendant resisted arrest. Detective Jorge Quesada, who also responded to the dispatch, joined the effort to subdue defendant. Investigators found a machete and the robbery proceeds in the area where defendant was arrested. Police recovered a sweatshirt, one glove, and sneakers with a white sole and stripes from defendant.

At defendant's trial, the cashier narrated the gas station's surveillance footage for the jury. Detective Quesada testified next, and he also narrated the footage, which he reviewed prior to testifying. During the narration, he referred to an individual depicted in the video as "the defendant" twice. Defense counsel did not object. While showing surveillance footage, the prosecutor asked about "the defendant's shoes." Detective Quesada described the shoes as having white soles and three white stripes. The prosecutor next showed the detective a pair of sneakers admitted into evidence and Detective Quesada testified, "[t]hese were the sneakers that the defendant was wearing at the time of his arrest." Defense counsel objected, but the trial judge permitted Detective Quesada to testify about the similarities between the sneakers he saw on the video and the sneakers worn by defendant at the time of his arrest.

1

Defendant was convicted of first-degree robbery and other offenses.  On appeal, he challenged Detective Quesada's testimony as "improper lay-witness opinion testimony as to the content of the surveillance video and the identity of the robber."  The Appellate Division affirmed defendant's convictions and sentence.  The Court granted certification limited to the lay-witness opinion issue.  240 N.J. 259 (2019).

**HELD:**  The detective should not have referenced defendant in his summary of the surveillance footage.  Here, however, that fleeting reference did not amount to plain error in light of the other evidence produced.  And the detective's testimony regarding the sneakers was proper.  He saw the sneakers on the video prior to testifying and had first-hand knowledge of what the sneakers looked like because he saw defendant wearing them on the night of his arrest.  N.J.R.E. 701 requires only that testimony be rationally based on the witness's perception and that such testimony help the jury.

1.  N.J.R.E. 701 governs the admission of a lay witness's opinion testimony.  The first prong of that Rule requires the testimony to be based on the witness's "perception," which rests on the acquisition of knowledge through use of one's senses.  The second requirement of N.J.R.E. 701 is that lay-witness opinion testimony be limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue.  (pp. 17-18)

2.  The Court reviews in detail cases in which it considered police officer opinion testimony.  In State v. McLean, an officer saw the defendant hand some small items to a second person, who then handed defendant what appeared to be money.  205 N.J. 438, 443-44 (2011).  At trial, the officer testified as to what he saw during the surveillance, identified the defendant by name, and stated he saw "hand-to-hand drug transactions."  Id. at 445.  The McLean Court concluded that the officer's testimony regarding drug transactions was improper "both because it was an expression of a belief in defendant's guilt and because it presumed to give an opinion on matters that were not beyond the understanding of the jury."  Id. at 463.  In State v. Lazo, the Court noted that "lay witness testimony is permissible where the witness has had sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful."  209 N.J. 9, 22 (2012).  The Lazo Court held that an officer's lay opinion testimony as to whether the defendant's arrest photo closely resembled a composite sketch of the defendant should not have been allowed because it was not based on the officer's prior knowledge, but rather "stemmed entirely from the victim's description."  Id. at 23-24.  (pp. 18-21)

3.  In contrast, a police officer's lay opinion testimony was found admissible in State v. LaBrutto, 114 N.J. 187, 191 (1989).  Noting that the officer conducted his own investigation of an automobile accident, the LaBrutto Court held that his testimony "was rationally based on what he observed . . . and it was helpful to the jury's full comprehension of the facts in question."  Id. at 202.  Significantly, the Court found no merit in the position that the officer's opinion on the point of impact invaded the province

2

of the jury or was "unnecessary because the average juror can readily determine the point of impact from the officer's description of the physical evidence." Id. at 199.  (pp. 21-22)

4.  Here, Detective Quesada referred to defendant as "the defendant" only twice in narrating the surveillance footage, and defense counsel did not object those references.  Although those references were error, they were not so prejudicial as to meet the plain error standard, in light of the circumstantial evidence of the robber's identification.  The Court stresses, however, that in similar narrative situations, a reference to "defendant," which can be interpreted to imply a defendant's guilt, should be avoided in favor of neutral, purely descriptive terminology.  (pp. 22-24)

5.  Admitting Detective Quesada's testimony about the sneakers was not improper.  N.J.R.E. 701 does not require the lay witness to offer something the jury does not possess or prohibit testimony when the evidence in question has been admitted.  Detective Quesada's testimony satisfied N.J.R.E. 701 as written.  First, he had first-hand knowledge of what the sneakers looked like; therefore, his lay witness opinion as to the similarities between the sneakers from the footage and the sneakers he saw that night was rationally based on his perception, in accordance with Lazo.  Second, his testimony was helpful to the jury even though the jury may have been able to evaluate whether the sneakers were similar to those in the video, in keeping with LaBrutto.  Detective Quesada's testimony did not include an ultimate determination as to defendant's guilt, unlike in McClean, and it assisted the jury in determining the robber's identity.  (pp. 24-27)

**The judgment of the Appellate Division is AFFIRMED.**

**JUSTICE LaVECCHIA, dissenting,** stresses that the Court has warned in earlier decisions of the dangers of lay opinion testimony offered by police officers and opines that Detective Quesada's lay opinion testimony unfairly bolstered and infected the identification and infringed on the exclusive domain of the jury as the ultimate trier of fact.  As to the detective's use of "the defendant," the dissent observes that the jury must have inferred that Detective Quesada either thought defendant was guilty or had additional knowledge, inadmissible in court, that implicated defendant; in either case, it was wrong to offer such an opinion.  In the dissent's view, further, the detective should not have testified about the contents of the video because he had no direct personal knowledge beyond that of anyone else who could look at the video at any point in time, and he should not have been allowed to comment on similarities in clothing, because the jury did not need help comparing the appearance of a pair of shoes entered into evidence to shoes on a video.  In a case where identity was the issue, the missteps here easily could have swayed the jury and are not harmless, in the dissent's view.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON and SOLOMON join in JUSTICE FERNANDEZ-VINA'S opinion.  JUSTICE LaVECCHIA filed a dissent, in which JUSTICES ALBIN and PIERRE-LOUIS join.**

3

# SUPREME COURT OF NEW JERSEY
## A-37 September Term 2019
### 083236

State of New Jersey,

Plaintiff-Respondent,

v.

Amrit Singh, a/k/a
Andy Singh,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| September 29, 2020 | January 21, 2021 |

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Nancy A. Hulett, Acting Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Nancy A. Hulett, of counsel and on the briefs).

Frank Muroski, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Frank Muroski, of counsel and on the brief).

In this case, the Court must decide whether a detective's testimony at the trial of defendant Amrit Singh violated N.J.R.E. 701 and requires reversal of defendant's convictions. Specifically, we consider whether it was plain error for the trial court to allow the detective to make two references to "the defendant" in narrating the surveillance footage of a robbery for the jury. We must also decide whether the detective's testimony concerning defendant's sneakers violated N.J.R.E. 701, when the sneakers and the surveillance video were both admitted into evidence.

N.J.R.E. 701 provides that a lay witness's opinion testimony "may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." Here, the issue is whether N.J.R.E. 701 was violated when a testifying detective referenced the suspect seen in surveillance footage of a robbery as "the defendant" and stated that the sneakers worn by the suspect in the surveillance video looked similar to those retrieved from defendant the night he was arrested.

The Appellate Division found that the detective's narration of the surveillance footage was inadmissible lay opinion testimony under N.J.R.E.

701 and that his identification of defendant as the robber was improper. The court held, however, that such errors did not amount to plain error because "the circumstantial evidence culminating in defendant's arrest was compelling." The Appellate Division did not address the detective's testimony that the sneakers he saw on the video looked similar to those worn by the defendant the night he was arrested.

We now affirm the judgment of the Appellate Division. The detective should not have referenced defendant in his summary of the surveillance footage. Here, however, that fleeting reference did not amount to plain error in light of the other evidence produced. And the detective's testimony regarding the sneakers was proper. He saw the sneakers on the video prior to testifying and had first-hand knowledge of what the sneakers looked like because he saw defendant wearing them on the night of his arrest. N.J.R.E. 701 requires only that testimony be rationally based on the witness's perception and that such testimony help the jury.

I.

A.

We begin by summarizing the pertinent facts and procedural history. On January 20, 2015, Kamlesh Shah was working as a cashier at a gas station in Metuchen. Shah testified that just before 10:20 p.m., a man entered the store

3

wielding a machete and told Shah to give him the money. Shah described the man who threatened him with the large machete as thin and wearing dark clothes and gloves; Shah could not describe the man's face because it was completely covered. Shah complied with the man's request for the money, and the man fled toward Route 1 South. The events were captured on the gas station's surveillance video, which police retrieved that night.

Shah called the police, and two officers, Officer Jeian Rastegarpanah and his partner, were dispatched to the scene. The suspect was described as a male wearing dark clothing.

After arriving at nearby apartments, about a quarter mile from the gas station, the officers noticed an individual with his back turned toward them who was wearing dark clothing. The suspect turned and ran, and the officers chased after him on foot. Officer Rastegarpanah testified that he saw the suspect's face for "maybe a second, half a second" because the suspect turned his head only briefly before fleeing. Officer Rastegarpanah separated from his partner during the chase and notified police headquarters that they "[l]ost sight of a black male wearing a black hoodie." He also testified that the suspect dropped a shopping bag mid-chase. Officer Rastegarpanah eventually lost sight of the suspect during the chase and consequently decided to search a nearby area.

4

Officer Rastegarpanah entered the yard of a nearby house, the side gate of which was open, and noticed a black sweatshirt on the ground. Continuing further around the back of the house, Officer Rastegarpanah found an individual with his back against the house, sweating and breathing heavily. That individual -- later identified as defendant -- was wearing dark clothing, and Officer Rastegarpanah testified his height was similar to that of the suspect he had chased moments earlier. Officer Rastegarpanah ordered defendant to get on the ground, but defendant refused, stating he was "just trying to score some drugs." Officer Rastegarpanah wrestled defendant to the ground and ordered him to put his hands behind his back. Detective Jorge Quesada, who also responded to the dispatch, heard Officer Rastegarpanah giving commands nearby and jumped a fence to help subdue defendant.

The officers arrested and searched defendant, finding no weapons. Defendant was taken to a hospital. In the backyard where defendant was arrested, crime-scene investigators found a jacket with a wallet in one of its pockets; it contained a foil packet that later tested positive for Suboxone, a controlled dangerous substance. In the area where Officer Rastegarpanah arrested defendant, investigators found a "Hello Kitty" cap, a machete, and a plastic bag with the robbery proceeds. Back at the hospital, police took a sweatshirt, one glove from the sweatshirt's pocket, and sneakers with a white

5

sole and stripes from defendant, among other items. Investigators could not recover fingerprints from the scene, and DNA testing of the "Hello Kitty" cap was inconclusive as to whether it belonged to defendant.

B.

Defendant was charged with first-degree robbery, N.J.S.A. 2C:15-1; third-degree theft, N.J.S.A. 2C:20-3; third-degree possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4(d); fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d); third-degree resisting arrest by force, N.J.S.A. 2C:29-2(a)(3); fourth-degree resisting arrest by flight, N.J.S.A. 2C:29-2(a)(2); fourth-degree obstruction, N.J.S.A. 2C:29-1; and fourth-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(a).

At trial, Shah narrated the gas station's surveillance footage for the jury. He stated he was unable to see the robber's face. Detective Quesada testified next, outlining his role in the investigation and testifying to the events leading up to defendant's arrest. He also narrated the gas station's surveillance footage, which he reviewed before testifying.

The following exchange occurred between Detective Quesada and the prosecutor:

> [Prosecutor:]  Let's start with Camera 7, Detective. Can you utilize the laser pointer, and describe for the jury what's depicted there?

6

[Quesada:]  This is where the suspect is approaching the gas station, the inside store.

. . . .

[Quesada:]  Right over here he's about [to] enter the doors into the store area of the gas station.

. . . .

[Quesada:]  That's him walking towards the front register, right here.

. . . .

[Quesada:]  That's when the defendant is there pointing the knife at the gas station attendant.

[Prosecutor:]  And then it's picked up on the -- the rest of the incident is on -- what camera is that?

[Quesada:]  That's going to be Camera 8.  Right here he's demanding for the money, and pointing the knife at the -- at the victim.

Defense counsel did not object to that testimony.  Detective Quesada was then shown another exhibit with different surveillance footage from the gas station and was asked to narrate it:

[Quesada:]  The suspect, at the first shot, was him coming around the dumpster area of the gas station, coming around the store, and then coming up into the front door here.  He's walking in, you see him going to the right.  And as he approaches with the knife in front of the victim's body there.  He opens the door, starts

7

demanding the money, and I -- I believe that he instructed him -- he knew about the second register, the second drawer, to get the money out of that drawer also.

[Prosecutor:] Detective, do you see the defendant's shoes depicted in this picture?

[Quesada:] Yeah. Right here you have white soles at the bottom, with three stripes going down the side. You can see the white sole on his right shoe also.

. . . .

[Prosecutor:] Detective, I'm going to show you what has been marked as S (indiscernible) that's S-4. . . . Can you describe what S-4 is for the jury, please?

[Quesada:] These were the sneakers that the defendant was wearing at the time of his arrest, and these are the sneakers --

[Defense counsel:] Objection, Judge. Can we be heard[?]

(Sidebar begins at 3:48:27 p.m.)

[Defense counsel:] (indiscernible)

THE COURT: He can say the [sic] look like the sneakers he seeks [sic] in the video. He can say that.

(Sidebar ends at 3:48:46 p.m.)

THE COURT: Overruled. Lead him, [prosecutor].

. . . .

8

> [Prosecutor:] Detective, so, again, were those the sneakers that were on the defendant when he was arrested?
>
> [Quesada:] Yes, sir.
>
> . . . .
>
> [Prosecutor:] Okay. And are those sneakers similar to the sneakers that you just observed -- we observed here in court today, on video?
>
> [Quesada:] Yes, sir.

Detective Quesada's testimony continued the next day. On cross-examination, defense counsel asked whether the gloves were important to the case. Detective Quesada replied, "[u]m, we found one glove on him. And he was wearing gloves in the video, the video that we saw here." Detective Quesada also stated that he was contacted by Officer Dean Janowski, who was reviewing the surveillance footage the night defendant was arrested. Officer Janowski gave Detective Quesada a description of the robber while watching the footage. On re-direct, the State replayed the surveillance video and the following exchange took place:

> [Prosecutor:] And this is generally the same footage that Officer Janowski was watching?
>
> [Quesada:] Yes, it is.

9

[Prosecutor:] So can you describe what's depicted here?

[Quesada:] You got a male entering wearing all black with black sneakers with white soles and stripes on the side of his sneakers.

[Prosecutor:] Did Detective -- did Officer Janowski tell you anything different on that evening?

[Quesada:] No. You can't see his face there because it's covered by some type of clothing. Everything looks black.

[Prosecutor:] If we can just utilize --

[Defense counsel:] Judge, I'm going to object to him testifying about the surveillance. He testified that he didn't review the surveillance that night. Officer Janowski can testify as to that.

THE COURT: You raised an issue, though, as to whether or not the description Officer Janowski gave to him was inappropriate. He's allowed to rebut that. Overruled.

[Quesada:] Right here's his mask. It's not a Halloween mask but a type of cover over.

. . . .

[Prosecutor:] Let's watch a little bit longer.

[Quesada:] The one glove there has a marking on the outside of the glove here also, that was important.

. . . .

10

[Prosecutor:]  Detective, just hold on one second.  I'm trying to find the spot on the surveillance tape.  Now, is there anything else about the sneaker that you could see that --

[Quesada:]  The three white stripes on the side of the sneaker.

[Prosecutor:]  And is that -- was that part of the description that Officer Janowski told you on January 20th over the phone?

[Quesada:]  Yes, sir.

[Prosecutor:]  Now, can you describe the clothing that you found the defendant in after you arrested him?

[Quesada:]  Yes.  He's wearing all black once we arrested him and there was a jacket next to where we were fighting on the side of the house and the officer found other clothing that was discarded right around the corner from the house on the other side of the back of the house.

[Prosecutor:]  But when you came upon him, the color of his -- what was the color of his clothing?

[Quesada:]  Black.

[Prosecutor:]  And his sneakers were similar to that depicted there?

[Quesada:]  Yes.

11

During Officer Rastegarpanah's testimony, he explicitly identified defendant as the suspect whom he initially chased and observed dropping the machete and plastic bag full of cash.

The jury convicted defendant on a lesser-included offense on the resisting arrest count and as charged on all other counts. He was sentenced to fourteen years' imprisonment, subject to the No Early Release Act on the first three counts. Defendant's one-year sentence for the certain persons not to possess weapons conviction was to run consecutively, and the judge ran the remaining counts concurrently.

## C.

Defendant appealed. Among other challenges to the trial court that are not relevant here, defendant challenged the testimony of Detective Quesada, reproduced above, as "improper lay-witness opinion testimony as to the content of the surveillance video and the identity of the robber."

The Appellate Division considered the detective's narration of the surveillance footage in general and reference to defendant in particular, but did not address the detective's testimony as to the sneakers. Ultimately, the court held that, "[a]lthough Quesada should not have been permitted to narrate the film, and certainly should have not been permitted to identify defendant," those errors did not rise to the level of plain error because defendant did not

"establish[] that the improper testimony raises a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." The appellate court affirmed both defendant's convictions and sentence.

This Court granted defendant's petition for certification, "limited to the issue of whether the prosecutor elicited lay-witness opinion testimony constituting plain error." 240 N.J. 259 (2019). We granted the Attorney General's motion for leave to appear as amicus curiae.

## II.

### A.

Defendant argues that the improper admission of Detective Quesada's opinion testimony as to the content of the surveillance video and the identity of the robber amounted to plain error. Specifically, defendant contends that Detective Quesada's testimony was improper lay opinion testimony because the detective was not an eyewitness to the robbery and thus lacked personal knowledge of what the surveillance footage showed; defendant adds that Quesada's testimony was not helpful to the jury because the jury was in the same position to evaluate the footage.

According to defendant, Detective Quesada's narration was improper because he identified the suspect on the video as defendant and because his testimony regarding the sneakers was not helpful for the jury because the

13

sneakers were in evidence and the jury could compare the shoes in evidence to those on the video. Defendant further contends that permitting the disputed testimony allowed Detective Quesada to opine on defendant's guilt by implying the suspect in the video was defendant.

B.

The State asserts that Detective Quesada's testimony was properly admitted because he knew what defendant was wearing when defendant was arrested and his testimony was helpful to the jury given that the State had no other witnesses to identify defendant as the person in the video footage. The State thus argues that Detective Quesada satisfied both requirements of N.J.R.E. 701: he had personal knowledge as to what the sneakers looked like, having seen defendant wearing them, and his testimony assisted the jury, given the lack of any eyewitnesses to identify defendant as the robber.

Although the State agrees that Detective Quesada should not have referred to the suspect in the video as defendant, such a statement did not, in its view, amount to plain error. The State points out that Detective Quesada's few references to defendant as "the defendant" in his testimony were merely mistakes -- Detective Quesada otherwise referred to defendant as "the suspect." The State stresses that even if Detective Quesada's narration was erroneously admitted, the circumstantial evidence of defendant's identification

14

-- particularly the clothing found at the crime scene and seen on the surveillance video -- was compelling.

C.

The Attorney General, as amicus, concentrates on Detective Quesada's testimony about the sneakers and argues that "the officer's narration satisfied the rules of evidence and it was not plain error; it was based on the officer's perception, and it helped the jury determine a fact in issue." Relying on guidance set forth in State v. Lazo, 209 N.J. 9 (2012) -- and stressing the distinctions between that case and the present matter -- the Attorney General urges us to affirm the Appellate Division's decision but also to "part company with the Appellate Division and rule that the video narration was proper lay-opinion testimony under N.J.R.E. 701."

III.

A.

"[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Nantambu, 221 N.J. 390, 402 (2015) (alteration in original) (quoting State v. Harris, 209 N.J. 431, 439 (2012)). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a

15

manifest denial of justice resulted."'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). Accordingly, such rulings "are subject to limited appellate scrutiny," State v. Buda, 195 N.J. 278, 294 (2008), as trial judges are vested "with broad discretion in making evidence rulings," Harris, 209 N.J. at 439 (quoting State v. Muhammad, 359 N.J. Super. 361, 388 (App. Div. 2003)).

When a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard. See R. 2:10-2; see also State v. Camacho, 218 N.J. 533, 554 (2014). Under that standard, an unchallenged error constitutes plain error if it was "clearly capable of producing an unjust result." R. 2:10-2. "Thus, the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." State v. R.K., 220 N.J. 444, 456 (2015).

We have previously noted that "[p]lain error is a high bar and constitutes 'error not properly preserved for appeal but of a magnitude dictating appellate consideration.'" State v. Santamaria, 236 N.J. 390, 404 (2019) (quoting State v. Bueso, 225 N.J. 193, 202 (2016)). And we have cautioned that "rerun[ning] a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on

16

appeal." Id. at 404-05 (second alteration in original) (quoting State v. Ross, 229 N.J. 389, 407 (2017)).

To determine whether an alleged error rises to the level of plain error, it "must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Walker, 203 N.J. 73, 90 (2010)).

B.

A lay witness's opinion testimony is governed by N.J.R.E. 701, which presently provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and
>
> (b) will assist in understanding the witness' testimony or determining a fact in issue.[1]

"We have made clear that '[t]he purpose of N.J.R.E. 701 is to ensure that lay opinion is based on an adequate foundation.'" State v. Bealor, 187 N.J. 574, 586 (2006) (alteration in original) (quoting Neno v. Clinton, 167 N.J. 573, 585 (2001)). Accordingly, lay opinion testimony can be admitted only "if it falls

---

[1] We quote N.J.R.E. 701 as amended effective July 1, 2020. The 2020 amendments were stylistic in nature.

within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." State v. McLean, 205 N.J. 438, 456 (2011).

The first prong of N.J.R.E. 701 requires the witness's opinion testimony to be based on the witness's "perception," which rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." Id. at 457. In McLean, we listed some "[t]raditional examples of permissible lay opinions," including "the speed at which a vehicle was traveling"; "the distance of a vehicle from the intersection where an accident occurred"; "signs and behaviors indicative of an individual's intoxication"; "and, with an appropriate foundation, the value of personal property owned by the witness." Id. at 457 (collecting cases). "[U]nlike expert opinions, lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460.

The second requirement of N.J.R.E. 701 is that lay-witness opinion testimony be "limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 458.

In McLean, a police officer conducting a surveillance operation witnessed two transactions. Id. at 443. Each time, the defendant was

18

approached by a second individual, left, went to a car, and returned within a brief period of time. Id. at 443-44. The defendant handed some small items to the second person, and that second person then handed defendant what appeared to be money. Ibid. At trial, the officer testified as to what he saw during the surveillance, identified defendant by name, and stated he saw "hand-to-hand drug transactions." Id. at 445.

In evaluating that testimony, we first set forth the contours of permissible "fact testimony" by police officers, noting that "an officer is permitted to set forth what he or she perceived through one or more of the senses." Id. at 460. We explained that

> [f]act testimony has always consisted of a description of what the officer did and saw, including, for example, that defendant stood on a corner, engaged in a brief conversation, looked around, reached into a bag, handed another person an item, accepted paper currency in exchange, threw the bag aside as the officer approached, and that the officer found drugs in the bag. Testimony of that type includes no opinion, lay or expert, and does not convey information about what the officer "believed," "thought" or "suspected," but instead is an ordinary fact-based recitation by a witness with first-hand knowledge.
>
> [Ibid. (citation omitted).]

We concluded that the officer's testimony in McLean went beyond the bounds of acceptable fact testimony and was improper as lay opinion

19

testimony "both because it was an expression of a belief in defendant's guilt and because it presumed to give an opinion on matters that were not beyond the understanding of the jury." Id. at 463.

The following year, in State v. Lazo, "we consider[ed] whether it was proper for a police officer to testify at trial about how and why he assembled a photo array." 209 N.J. 9, 12 (2012). As part of that opinion, we reviewed lay opinion testimony from a law enforcement officer called to identify a defendant from a photograph. Id. at 22. We drew guidance from United States v. Beck, 418 F.3d 1008 (9th Cir. 2005), in which the United States Court of Appeals for the Ninth Circuit explained that "lay witness testimony is permissible where the witness has had 'sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful.'" Lazo, 209 N.J. at 22 (quoting Beck, 418 F.3d at 1015). According to the Beck court,

> [w]hether that opinion is "helpful[]" . . . depends on various factors including the witness' familiarity with the defendant's appearance when the crime was committed, or with the defendant's manner of dress, if relevant, whether the defendant disguised his appearance during the offense or altered her looks before trial, and "whether the witness knew the defendant over time and in a variety of circumstances."
>
> [Ibid. (quoting Beck, 418 F.3d at 1015).]

20

We also noted in <u>Lazo</u> that, in addition to those familiarity-based considerations, "[c]ourts evaluating whether a law enforcement official may offer a lay opinion on identification also consider, among other factors, whether there are additional witnesses available to identify the defendant at trial." <u>Id.</u> at 23.

Given those principles, we held in <u>Lazo</u> that the police officer's lay opinion testimony as to whether the defendant's arrest photo closely resembled a composite sketch of the defendant should not have been allowed because it was not based on the officer's prior knowledge. <u>Id.</u> at 24. Specifically, the officer did not witness the crime and did not know the defendant -- "the officer's opinion stemmed entirely from the victim's description." <u>Ibid.</u> We held that the officer's testimony impermissibly bolstered the victim's account of the offense: "Despite a lack of personal knowledge, the detective conveyed his approval of the victim's identification by relaying that he, a law enforcement officer, thought defendant looked like the culprit as well." <u>Ibid.</u>

In contrast to the testimony found impermissible in <u>McLean</u> and <u>Lazo</u>, a police officer's lay opinion testimony as to a vehicle's point of impact in an automobile accident case was found admissible under <u>Evidence Rule</u> 56(1), the predecessor to N.J.R.E. 701, in <u>State v. LaBrutto</u>, 114 N.J. 187, 191 (1989).

21

In LaBrutto, we noted that the investigating officer's lay opinion as to the point of impact was based on sufficient evidence. Id. at 201. Namely, he conducted his own investigation of the accident, making observations about "the weather and visibility, the location of the cars, the damage to the cars, the location of [the decedent's] body, the defendant's condition, [and] the tire marks in the grass as well as their direction," as well as other evidence. Ibid. We held that the investigating officer's testimony "was rationally based on what he observed at the scene of the accident and it was helpful to the jury's full comprehension of the facts in question." Id. at 202.

Significantly, in reaching that holding,

> [w]e [found] no merit in the position that the police officer's opinion on the point of impact should be excluded because it invade[d] the province of the jury, or that the officer's testimony [was] unnecessary because the average juror can readily determine the point of impact from the officer's description of the physical evidence.
>
> [Id. at 199.]

## IV.

Applying those legal principles to the facts of this case, we conclude that although it was error for Detective Quesada to refer to an individual depicted in the surveillance video as "the defendant" in his narration of that video, that error was harmless given the fleeting nature of the comment and the fact that

22

the detective referenced defendant as "the suspect" for the majority of his testimony. Moreover, we conclude that Detective Quesada's testimony that the sneakers he saw in the video were similar to those he saw defendant wearing the night he was arrested was proper lay opinion testimony under N.J.R.E. 701.

## A.

During Detective Quesada's testimony, he referred to defendant as "the defendant" only twice in narrating the surveillance footage. All other references to defendant were as "the suspect," "a male," "a person," or "the individual." Defense counsel did not object to the detective's references to "defendant" at trial and, although those references to "defendant" were error, we conclude that they were not so prejudicial as to meet the plain error standard. That is, they were not "clearly capable of producing an unjust result." R. 2:10-2.

In this case, the circumstantial evidence of the robber's identification was significant enough that Detective Quesada's passing references to defendant as "the defendant" do not amount to plain error. Although Officer Rastegarpanah lost sight of the robber while chasing him, the officer eventually found defendant in the backyard of a nearby house, sweating and breathing heavily. Defendant's statement that he was only looking to buy

some drugs did not match his physical state when found. Additionally, Officer Rastegarpanah identified defendant as the individual he chased, as the person who dropped the machete and the bag found to contain the robbery proceeds, and as the person he struggled to subdue.

Having analyzed the record, we conclude that Detective Quesada's few references to defendant as "the defendant," although error, do not amount to plain error under Rule 2:10-2, given their fleeting nature. We stress, however, that in similar narrative situations, a reference to "defendant," which can be interpreted to imply a defendant's guilt -- even when, as here, they are used fleetingly and appear to have resulted from a slip of the tongue -- should be avoided in favor of neutral, purely descriptive terminology such as "the suspect" or "a person."

B.

Next, we address defendant's contention regarding Detective Quesada's testimony as to the similarity between the sneakers he observed on the gas station's surveillance video and the sneakers he observed defendant wearing when he assisted Officer Rastegarpanah in apprehending defendant.

Defendant contends that Detective Quesada's statement as to the similarity between the two was improper because the sneakers were admitted into evidence, and the jury was capable, having seen the surveillance video, of

24

comparing the sneakers in evidence to those on the video. Defendant argues that admitting Detective Quesada's testimony as lay opinion testimony was therefore improper because the detective was in no better position to evaluate the similarity between the sneakers than the jury. We disagree with that proposition and with the additional requirement defendant seeks to graft upon N.J.R.E. 701.

There is no requirement in N.J.R.E. 701 that the testifying lay witness be superior to the jury in evaluating an item. The Rule simply states, in subsection (b), that the witness's testimony must "assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. That Rule does not require the lay witness to offer something that the jury does not possess. Nor does it prohibit testimony when the evidence in question has been admitted, as it was here. Such a construction of N.J.R.E. 701 would even prohibit questions asked by defense counsel as to whether shoes a family member saw defendant leave the house in resembled the shoes in evidence. We decline to write such an additional requirement into that rule of evidence.

We conclude that Detective Quesada's testimony satisfied N.J.R.E. 701 as written. First, Detective Quesada had first-hand knowledge of what the sneakers looked like, having seen them on defendant when he was assisting Officer Rastegarpanah. Therefore, his lay witness opinion as to the similarities

25

between the sneakers from the surveillance footage and the sneakers he saw that night was rationally based on his perception, in accordance with the principles enunciated in Lazo, 209 N.J. at 22.

Second, his testimony was helpful to the jury. Having had first-hand knowledge of what the sneakers looked like, Detective Quesada permissibly testified that the sneakers on the video looked like those he witnessed defendant wearing the night he helped arrest defendant.

Simply because the jury may have been able to evaluate whether the sneakers were similar to those in the video does not mean that Detective Quesada's testimony was unhelpful. Nor does it mean that Detective Quesada's testimony usurped the jury's role in comparing the sneakers. Indeed, the jury was free to discredit Detective Quesada's testimony and find that the sneakers in evidence were dissimilar to those on the surveillance video. See LaBrutto, 114 N.J. at 199 (rejecting the argument that testimony based on an officer's first-hand perceptions as to a point of impact should be excluded if the jury has the means to reach its own conclusions about the point of impact).

Our opinion in McLean does not dictate the opposite result. In McLean, the officer testified as to an ultimate determination that the defendant was engaging in "hand-to-hand drug transactions." 205 N.J. at 445. Conversely,

26

Detective Quesada made no such ultimate determination. He never stated that the sneakers seen in the surveillance footage were the sneakers he saw defendant wearing that night. He testified as to their similarity. Under N.J.R.E. 701, such testimony was proper because it was rationally based on his perceptions and assisted the jury in determining the robber's identity.

In sum, we find no abuse of discretion in the trial court's determination to allow Detective Quesada's testimony about the sneakers. See Sanchez-Medina, 231 N.J. at 468.

V.

We affirm the judgment of the Appellate Division.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON and SOLOMON join in JUSTICE FERNANDEZ-VINA'S opinion. JUSTICE LaVECCHIA filed a dissent, in which JUSTICES ALBIN and PIERRE-LOUIS join.

State of New Jersey,

Plaintiff-Respondent,

v.

Amrit Singh, a/k/a
Andy Singh,

Defendant-Appellant.

JUSTICE LaVECCHIA, dissenting.

Defendant Amrit Singh was convicted by a jury of the robbery of a gas station attendant and related offenses. The trial was a pitched battle over the identification of the perpetrator of that robbery. To win that battle, the prosecution relied on the impermissible testimony of a police officer, who was allowed first to narrate the events of the robbery -- which he had not witnessed -- as captured on a video and then to offer lay opinion testimony that items of apparel taken from defendant matched those of the perpetrator in the video. In addition, during the narration, the officer evidently slipped and referred to the person as "defendant" instead of "the perpetrator," thus removing any pretense that the officer was identifying defendant.

1

That lay opinion testimony unfairly bolstered and infected the identification and infringed on the exclusive domain of the jury as the ultimate trier of fact. The Appellate Division agreed that the testifying police officer overstepped the bounds of lay testimony in his narration and in his "implied and explicit identification of defendant" as the "robber"; the court found the error harmless, however. I do not agree that errors of that magnitude did not have the clear capacity to cause an unjust result. I therefore would reverse defendant's conviction and remand for a new trial.

I also dissent because my colleagues in the majority have blessed the use of an officer's lay testimony in this case. We have in our earlier decisions warned of the dangers of lay opinion testimony offered by police officers. This case did not pose a novel application of N.J.R.E. 701.

The jury had the video and had the physical evidence. The lay opinion testimony was not necessary to "help" the jury. It usurped the jury's assessment of an inanimate object that the jury was perfectly capable of assessing on its own.

And the lay testimony provided in this matter by a police officer, viewed in its totality, was problematic in its impact. The victim was never asked to identify defendant. Nor was he asked to comment on the similarity of items in evidence to those worn by the perpetrator and depicted on the surveillance

2

video.  The sneakers defendant was wearing when arrested on the night of the robbery constituted part of the physical evidence.  They were presented to the jury for comparison with the surveillance video that captured the encounter between the robber and victim.  The jury was fully capable of performing its fact-finding function without the officer's assistance.

The officer who testified was just someone who looked at the video after the fact and came to his own conclusion.  If that constitutes a sound basis for lay opinion testimony by a police officer, then our prior guardrails on the proper use of such testimony by an officer were for naught.  The officer simply, and improperly, bolstered the identification sought by the State.

In a case where identity was the issue, the missteps here easily could have swayed the jury and are not harmless, in my view.  Accordingly, I would reverse the Appellate Division's judgment.

## I.

The evidence at trial revealed the following.  Just before 10:20 p.m. on January 20, 2015, a man, wearing dark clothing and gloves and wielding a machete-like knife, robbed the Shell gas station in Metuchen.  He was described as a thin man, approximately five feet, nine inches tall.

The cashier on duty, Kamlesh Shah, reported the robbery to two officers.  Shah described the robbery to them.  The man told Shah to give him cash but

3

not one-dollar bills. Shah complied, putting what he believed to be between $2,000 and $2,200 in a plastic bag. The robber fled with the money toward Route 1 South.

A dispatch went out. Officer Rastegarpanah and his partner heard about the robbery and headed in the direction of Route 1 South to look for the suspect. While in a parking lot outside Menlo Park Apartments, in a neighborhood about a quarter mile from the gas station, they came upon a man matching the suspect's general description. When the person suspected as the perpetrator saw the officers, he ran, and the officers chased him. During the chase, Officer Rastegarpanah described the individual to dispatch as "a black male wearing a black hoodie." The individual reportedly dropped a shopping bag during the chase, and the police later recovered a knife and a bag containing $2,366 near where Officer Rastegarpanah first saw him.

During the chase, Officer Rastegarpanah lost sight of the suspected perpetrator. He then saw Singh in the vicinity of the apartment complex and chased him. The officer believed Singh to be the person he had previously chased and later identified Singh as such. The officer struggled to subdue Singh, and during that struggle, Singh told Officer Rastegarpanah that he was "just trying to score some drugs." Eventually, Detective Quesada arrived on the scene and helped his fellow officer handcuff Singh. Quesada himself had

4

not been part of Rastegarpanah's search or chase that ultimately resulted in the apprehension of Singh.

From the area near where Singh was arrested, investigators recovered a gray, orange, and white Columbia-brand jacket. They also found Singh's wallet in the pocket of the jacket; the wallet contained Suboxone, a controlled dangerous substance.

Singh is approximately as tall as the man described to Officer Rastegarpanah. When he was arrested in a neighborhood within the general vicinity of the highway gas station robbed that night, Singh was wearing a dark sweatshirt, but it bore a white logo. He also had on sneakers with white soles and stripes on the sides. The sweatshirt held one glove in a pocket. Officers obtained surveillance footage from the gas station that depicted the robbery. The State did not gather any usable DNA evidence.

Singh was charged with armed robbery, in addition to weapons charges, and resisting, fleeing from, and obstructing arrest.

Shah testified for the State, narrating the surveillance video taken of the robbery he experienced. He was not asked to identify defendant or to express an opinion about any similarity between sneakers or clothes found on defendant after viewing the video footage.

5

Officer Rastegarpanah testified that he lost sight of the individual he first encountered but that he identified Singh as the man he chased and the man whom he perceived as having dropped a shopping bag, which was later found to be full of money and lying near a machete-like knife.

Detective Quesada, testifying after Shah, described his role in the investigation and how he came to the Menlo Park Apartments and helped Officer Rastegarpanah subdue and arrest Singh. Detective Quesada was also allowed to provide a second narration of the surveillance video. That narration began as an "authentication" of combined camera views and moved quickly into describing "details" for the jurors of what they were capable of viewing and judging for themselves. Detective Quesada had watched the footage <u>after</u> the arrest. He also testified that the footage was described to him by another officer after defendant had been apprehended and placed under arrest, claiming that the contents of the video (as described to him that evening) played a role in defendant's arrest for robbery. Importantly, that point was contested through cross-examination because Detective Quesada conceded that his reports filed after the incident do not mention being in cell phone communication with the officer who viewed the video at the Shell station. He stated that the conversation did not take place on police radio communications.

During the description of the video, Detective Quesada alternatively referred to the perpetrator as "the suspect" and "the defendant." The prosecutor also, at least once, referred to the man in the video as "the defendant," and asked Detective Quesada whether the man in the video had the same shoes on that Singh was wearing when he was arrested. Detective Quesada answered affirmatively. On cross-examination, Detective Quesada said that Singh "was wearing the gloves in the video." As noted, the sweatshirt Singh was wearing bore a white logo but the one depicted in the video did not.

On re-direct, the State replayed the surveillance footage, and Detective Quesada again narrated it, commenting on the similarities, or lack thereof, between what the man in the video was wearing and what Singh was wearing when he was arrested.

With respect to the interjection of objections during these exchanges, it appears that defense counsel did not act quickly enough to prevent Detective Quesada's use of "the defendant" to describe the man in the video, but counsel did raise an objection to Detective Quesada's comments regarding the similarity of the shoes Singh was wearing the night of the robbery to those worn by the robber in the video, and to Detective Quesada's lack of personal

knowledge of the events depicted in the video. The jury convicted Singh on all counts.

In an unpublished opinion, the Appellate Division stated that Singh had not objected to Detective Quesada's testimony and reviewed its admission only for plain error. The appellate court found Detective Quesada's narration and labelling of Singh as the perpetrator in the video to be impermissible lay opinions but concluded they were not plain error in light of the evidence against Singh. We granted Singh's petition for certification, "limited to the issue of whether the prosecutor elicited lay-witness opinion testimony constituting plain error." 240 N.J. 259 (2019).

## II.

### A.

To begin with, the lay opinion testimony of the officer was a contested point between the defense and the State and deserves being viewed in the setting in which it arose, not through the limiting lens of whether there was a specific objection to "narration." As noted, the narration began as authentication of the camera views and moved quickly into describing "details" that the jurors were capable of viewing and assessing themselves.

The Appellate Division determined that, "contrary to defendant's assertion on appeal, he did not object to the detective's narration of the

8

surveillance video."  But, Singh's attorney objected twice during Detective

Quesada's testimony.  First, the following exchange occurred.

> [DETECTIVE QUESADA]:  These were the sneakers that the defendant was wearing at the time of his arrest, and these are the sneakers --
>
> [Defense Counsel]:  Objection, Judge.  Can we be heard.
>
> (Sidebar begins.)
>
> [Defense Counsel]: (Indiscernible).
>
> THE COURT:  He can say the[y] look like the sneakers he sees in the video.  He can say that.
>
> (Sidebar ends.)
>
> THE COURT:  Overruled.  Lead him, [Counsel for the State].
>
> [Counsel for the State]:  I'm sorry, Judge?
>
> THE COURT:  You can lead him on that part, but --
>
> [Counsel for the State]:  Thank you, Judge.

Although the exact words that defense counsel said to the trial court were not

picked up by the recording device, in context, it is clear that she objected to

Detective Quesada's opinion testimony regarding Singh's shoes.

Later, defense counsel said "Judge, I'm going to object to [Detective

Quesada] testifying about the surveillance.  He testified that he didn't review

the surveillance that night."  This was prompted by a line of questioning from

the State to Detective Quesada, asking him to describe a portion of the video in which the suspect enters the store.

In my view, to call this a plain error situation because of a lack of a specific objection in these circumstances to the "narration" by an officer purporting to authenticate surveillance footage is a crabbed view of what transpired at this trial. In my view, it is not a fair reading of this record to conclude that defendant's attorney failed to object to the narration.

B.

New Jersey Rule of Evidence 701 provides that,

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and
>
> (b) will assist in understanding the witness' testimony or determining a fact in issue.

Under subsection (a), we have said that "[t]he Rule does not permit a witness to offer a lay opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as he to form a conclusion.'" State v. McLean, 205 N.J. 438, 459 (all alterations except first in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)).

10

In other words, "unlike expert opinions, lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460.

Pursuant to subsection (b), N.J.R.E. 701 requires that, before a lay opinion may be rendered, it must be determined that the opinion "will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 458. An opinion is more likely to meet this standard if it helps to clarify something "unfamiliar to the average juror." Ibid. (quoting State v. Johnson, 309 N.J. Super. 237, 263 (App. Div. 1998)).

Furthermore, we have instructed that a police officer may not testify as to a criminal defendant's guilt or innocence. E.g., State v. Trinidad, 241 N.J. 425, 445 (2020); State v. Landeros, 20 N.J. 69, 74-75 (1955) (reversing a conviction because a police captain claimed that the defendant was "as guilty as Mrs. Murphy's pet pig"). We also recognize "that juries 'may be inclined to accord special respect to' police testimony," Trinidad, 241 N.J. at 446 (quoting State v. Frisby, 174 N.J. 583, 595 (2002)), and that a testifying police officer may, intentionally or not, lead the jury to believe that the police are in possession of additional damning information that proves that the defendant is guilty but is being kept from the direct hearing of the jury. See State v.

11

Branch, 182 N.J. 338, 349-50 (2005) (reversing a conviction "because a detective's hearsay testimony led to the 'inescapable inference' that the detective received information from an unknown source implicating the defendant in the crime," and stressing that, "'[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay'") (alteration in original) (quoting State v. Bankston, 63 N.J. 262, 271 (1973)).

## C.

Although I believe the Appellate Division did not apply the correct standard of review, I agree with the Appellate Division that "Quesada's narration of the surveillance video was inadmissible lay opinion testimony, and his implied and explicit identification of defendant as the robber was improper."

Each item of challenged testimony -- Detective Quesada's use of "the defendant," his narration of part of the video, and his opinion as to the resemblance between Singh's and the perpetrator's shoes -- deserves examination on its own and in the context of N.J.R.E. 701.

As to the first, we have held as squarely as we can that police witnesses cannot comment on whether the defendant in a criminal trial is guilty.

12

Trinidad, 241 N.J. at 445.  Indeed, no witness may so invade that special province of the jury, but the Court has recognized that it is especially injurious when police officers do so.  Landeros, 20 N.J. at 75.  Although Detective Quesada did not explicitly say that he thought Singh was guilty, to borrow a phrase, the "necessary inference," Trinidad, 241 N.J. at 446, that the jury must have drawn from Detective Quesada's testimony was that he either: (1) thought that Singh was guilty; or (2) had additional knowledge, inadmissible in court, that implicated Singh.  In either case, it was wrong for Detective Quesada to offer such an opinion.

Next, Detective Quesada should not have testified about the contents of the video because he did not have the requisite knowledge under N.J.R.E. 701(a).  Evidence Rule 701(a) mandates that "lay opinion testimony is limited to what was directly perceived by the witness."  McLean, 205 N.J. at 460.  As the record shows, Detective Quesada was not at the Shell station when it was robbed.  He therefore did not have the opportunity to directly perceive the taped robbery, and his testimony should have been excluded under N.J.R.E. 701(a).  As a person who later viewed the tape, he is in no special position to offer his opinion as to what the video showed.  If he could so testify, then what principled reason would prevent the State from calling any other officer -- or two, or three -- to tell the jury what they perceived the video to show?

13

Detective Quesada had no direct personal knowledge beyond that of anyone else who could look at the video at any point in time. But, his special position as a police officer -- and particularly as the officer who successfully subdued defendant when he was arrested -- carries the potential for real influence over the jury without any special personal knowledge to back it up.

Finally, Detective Quesada should not have been allowed to comment on the similarity between Singh's and the perpetrator's shoes or gloves because this was not helpful to the jury. N.J.R.E. 701(b) requires that proffered lay opinion "assist" the trier of fact. Simply stated, the jury did not need help comparing the appearance of a pair of shoes entered into evidence to shoes on a video. To be sure, this Court did recognize in State v. Lazo that if there were "a change in" a defendant's appearance, a police "officer could help [explain it to] the jurors," 209 N.J. 9, 24 (2012), but there is no evidence in this case that there was a substantial change in the appearance of Singh's shoes that would require Detective Quesada to opine on them. Accordingly, this testimony violated N.J.R.E. 701(b) and should never have been allowed.

### III.

In my view, the aforesaid missteps were not harmless. The opinion testimony coming from the mouth of a sworn law enforcement officer is impactful to a jury. And it was reinforced by the manner in which the

14

prosecutor inadvertently inserted defendant into the questioning of this witness. Thus, because these missteps were not harmless and vitiated the fairness of the proceedings, Singh is entitled to a new trial. See Trinidad, 241 N.J. at 459 (Albin, J., dissenting) (explaining that "[w]hen errors prejudice a defendant's right to a fair trial, 'our fundamental constitutional concepts dictate' that a new trial should be granted, regardless of 'our own views as to whether the evidence established the defendant's guilt'" (quoting State v. Orecchio, 16 N.J. 125 129 (1954))). In Trinidad, the superior officer of the policeman on trial offered his opinion that Trinidad was guilty, and the Court unanimously agreed on that aspect to the holding. See id. at 445-46.

To be sure, it is always regrettable when a case must be retried. Resources must be expended again and, with the passage of time, there is a cost to all parties involved. But the process that leads to a criminal conviction must be fair and, in my mind, that was lacking in defendant's trial here. The missteps here had the clear capacity to sway the jury, and therefore, they should not be passed over as harmless because they were not. Defendant is entitled to a new trial for all the fundamental constitutional reasons we have expressed in the past when insisting that a new trial is the only way to maintain the public's confidence in the fairness of a criminal conviction coming out of our system of judicial administration.

I respectfully dissent.