**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2979-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RICO PARKS a/k/a JAMES R.
PARKS, JAMEEL PARKS, PARKS
JAMES, JAMEEL PARTLOW,
JAMES R. PARTOW, RICCIO J.
PARK, ERIC R. PARKS, ERIC
PARK, REO PARKS, REKO
PARKS, RECO PARKS, JR., RECO
J. PARKS, RICO J. PARKS,
PARKS R. JAMES, RECO PARKS,

     Defendant-Appellant.

_____

Submitted January 13, 2021 – Decided April 16, 2021

Before Judges Geiger and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 12-06-0475.

Joseph E. Krakora, Public Defender, attorney for appellant (Rasheedah Terry, Designated Counsel, on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Albert Cernadas, Jr., Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Rico Parks appeals from a November 21, 2018 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. We affirm, substantially for the reasons set forth in Judge Robert J. Mega's thoughtful and thorough written opinion. We add only the following comments.

We discern the following facts from the record before us and incorporate the evidence adduced at trial referenced in our unpublished opinion. State v. Parks, No. A-3753-14 (App. Div. July 31, 2017). Defendant was convicted of the first-degree murder of his wife, Thya Wilson. N.J.S.A. 2C:11-3(a)(1), (2). William Cook, who was Wilson's uncle and lived with defendant and Wilson, testified that around 11:00 p.m. on Tuesday, January 3, 2012, he heard Wilson come through the front door of the apartment.[1] Id. at 2.

---

[1] Cook was certain Wilson was in the apartment because of the distinctive sound of her keys.

Later, Cook awoke to the sound of Wilson's voice saying, "I'm sorry, I'm sorry." Ibid. Cook testified that "it sounded as if she was crying, and as if someone was 'gettin[g] hit with a belt about three times.'" Id. at 2-3.

The next day, "Cook noticed that Wilson's car was parked outside." Id. at 3. Cook noticed Wilson's bedroom was clean, "which was unusual for her because she normally kept it 'messy,' and never made her bed." Ibid. Cook observed that defendant did not look worried and "made no efforts to reach Wilson." Ibid.

"By Thursday morning, Cook was becoming concerned because ordinarily when Wilson did not return home, she would reach out to him." Ibid. Also, "Cook noticed defendant left briefly with Wilson's vehicle." Ibid. Again, defendant did not search for Wilson. Ibid. Wilson's body was discovered on Friday morning outside of the front door of the apartment. Ibid.

One of the residents in the building, Aneesha Daniels, testified that around 7:45 p.m. on Tuesday, January 3, 2012, she saw someone in a ski mask in the lobby. Id. at 4. "As she entered the building, she recognized that it was

defendant from his voice."[2] Ibid. Daniels also recognized defendant based on his stature and eyes.

Kalifi Thomas, Wilson's son-in-law, learned she was missing on Wednesday from his wife, Wilson's daughter, and "after he left work in the afternoon, they went to Wilson's apartment." Ibid. While defendant remained in the living room, they looked around the apartment for ten to fifteen minutes. Ibid. Thomas believed it was unusual that Wilson's bedroom was neat since normally she kept it "really disheveled" and disorganized. Ibid. When he inspected the bedroom closet, he could not observe anything inside because there was a "wall of bags" obscuring his view. Ibid.

"Investigators examined the [apartment] with luminal spray, locating blood traces on" Wilson's bedroom floor. Id. at 5. After Sergeant Frank Coon opened Wilson's bedroom closet, "he smelled a foul odor [that] he identified with death." Ibid. Coon observed "a 'sharp instrument, a knife,' on the floor under a dresser in the bedroom." Ibid. The knife was later determined to be a "part of a set found in the kitchen." Ibid.

---

[2] Daniels has known the defendant since he married Wilson, and even attended their wedding.

A-2979-18

A DNA forensic expert and chemist, Donna Hansen, "identified blood swabs taken from Wilson's dresser and the floor of the bedroom" as Wilson's. Ibid. "The knife, when tested, had traces of Wilson's blood, as did the interior of a suitcase found in Wilson's bedroom closet." Ibid. The exterior cloth handle of the suitcase, when tested, matched defendant's DNA profile.

The medical examiner, Dr. Junaid Shaikh, opined "Wilson had died two days before the body was discovered on January 6, 2012." Id. at 6. "The cause of death was multiple blunt and sharp force injuries" to the head and upper extremities, and Wilson "had defense wounds on her hands." Ibid. Dr. Shaikh testified that, due to the trauma, Wilson also suffered from subarachnoid and subdural hemorrhages. Dr. Shaikh, acknowledging that Wilson had hypertensive cardiovascular disease, was emphatic that her heart disease did not contribute to the cause of death.

The day the body was discovered, defendant was taken to the local police station to be interviewed but was later brought to the Union County Prosecutor's Office because of an outstanding civil contempt warrant. Ibid. During that interview, defendant confessed to killing Wilson:

> She had just [come] in the house, did what she did. I
> heard what she said. I waited until she went to sleep.
> Walked in there, looked at her first. She was asleep. I

A-2979-18

thought about it. I was like, no, I ain't gonna do nothing. And I walked back in the other room.

I sat there. And just my heart just kept balling, balling from hearing what he said and what she said to him and shit like that there.

I just walked in the room and clobbered her. She jumped up and told me that she [was] sorry, [Rico]; I'm sorry, [Rico], sorry. After that I knocked her down. She fell on her stomach and after that I just kept pounding her, kept pounding her.

Word up. She kept trying to turn over. I wouldn't let her turn over cause I knew if she'd turn over, she would catch her breath. So I wouldn't let her turn over. After awhile she just stopped moving. And I just sat there looking at her.

. . . .

After that I cleaned it up. Put her in the suitcase, let it sit in the closets for awhile. And I was like I gotta get it out of this house cause sooner or later she [is] gonna start smelling and they [are] gonna smell it. So I gotta get her out [of] the house. So I cleaned up that day. I didn't clean up last night. Last night I just took her out of the house, put her in the hallway. It was about 3:30, four o'clock, left her in the hallway. Just went back, took a shower, clean[ed] some stuff in the room and went to sleep.

On June 20, 2012, a Union County grand jury indicted defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). After a six-day trial,

6

the jury convicted defendant on both counts. Defendant was sentenced to life subject to the No Early Release Act's eighty-five percent parole ineligibility, N.J.S.A. 2C:43-7.2, and a concurrent five-year term on the possession of a weapon offense. We affirmed defendant's conviction and sentence on direct appeal.

On March 19, 2018, defendant filed a pro se petition for PCR. On July 12, 2018, defendant filed a supplemental certification. Defendant was appointed counsel who filed a brief in support of his petition. On November 21, 2018, Judge Mega denied defendant's petition without an evidentiary hearing.

On appeal, defendant raises the following arguments for our consideration:

> POINT I
>
> THE PCR COURT'S ORDER THAT DENIED DEFENDANT'S PETITION FOR POST-CONVICITION RELIEF MUST BE REVERSED BECAUSE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN THE PROCEEDINGS BELOW.
>
> > A. Trial Counsel Failed to Investigate and Present Viable Mens Rea Defenses
>
> > > 1. Extreme Intoxication
> > > 2. Diminished Capacity
> > > 3. Insanity Defense

B.    Trial Counsel Failed to Request a Voice Identification Charge and to Obtain a Voice Identification Expert

      1.    Voice Identification Charge
      2.    Voice Identification Expert

C.    Trial Counsel's Act of Pressuring Defendant Not to Testify on His Own Behalf Amounted to Ineffective Assistance of Counsel.

D.    Trial Counsel's Mis-Advice During the Pre-Trial Conference Constituted Ineffective Assistance of Counsel.

E.    Trial Counsel's Failure to Seek the Exclusion of Ms. Daniels' Testimony Constituted Ineffective Assistance of Counsel (Not raised below).

POINT II

THE COURT SHOULD ALSO REMAND THE MATTER TO ADDRESS DEFENDANT'S PRO SE CLAIMS.[3]

POINT III

---

[3]  Defendant's pro se claim that his trial counsel was ineffective in failing to refute the medical examiner's opinions regarding Wilson's cause of death has no support in the record. Although Dr. Shaikh did acknowledge that Wilson had hypertensive cardiovascular disease, he opined that it did not contribute to her cause of death. Moreover, defendant did not present an affidavit or certification of a qualified medical professional averring that Wilson died due to her pre-existing medical conditions. Absent any affidavit or certification to the contrary, this claim of ineffectiveness is nothing more than a bald assertion. See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).

A-2979-18

THE PCR COURT ABUSED ITS DISCRETION WHEN IT DENIED DEFENDANT'S REQUEST FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE FOR INEFFECTIVE ASSISTANCE OF COUNSEL.

We address these issues in turn.

A.

Where, as here, the PCR judge "did not hold an evidentiary hearing on the claim defendant now raises on appeal, we 'conduct a de novo review.'" State v. Jackson, 454 N.J. Super. 284, 291 (App. Div. 2018) (quoting State v. Harris, 181 N.J. 391, 421 (2004)); see also State v. Blake, 444 N.J. Super. 285, 294 (App. Div. 2016).

To establish a prima facie claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test enumerated in Strickland v. Washington, 466 U.S. 668, 687 (1984), which our Supreme Court adopted in State v. Fritz, 105 N.J. 42, 58 (1987). To satisfy the first Strickland/Fritz prong, a defendant must establish that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. A defendant must rebut the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

9

that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). A defendant must make this showing by presenting more than "bald assertions that he [or she] was denied the effective assistance of counsel." State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). The law is "clear that . . . purely speculative deficiencies in representation are insufficient to justify reversal." Fritz, 105 N.J. at 64.

To satisfy the second Strickland/Fritz prong, a defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. A defendant must establish "a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the outcome." Id. at 694.

"With respect to both prongs of the Strickland test, a defendant asserting ineffective assistance of counsel on PCR bears the burden of proving his or her right to relief by a preponderance of the evidence." State v. Gaitan, 209 N.J. 339, 350 (2012). Moreover, "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700.

B.

Defendant argues that his trial counsel was ineffective in failing to investigate and present allegedly "viable" mens rea defenses including voluntary intoxication, diminished capacity, and insanity. These defenses, however, are wholly premised on the supposition that "he was heavily under the influence of drugs and alcohol during the alleged incident." We find defendant's contentions to be without merit.

It is well-settled that a voluntary intoxication defense can succeed only "if there exists a rational basis for the conclusion that defendant's 'faculties' were so 'prostrated' that he or she was incapable of forming an intent to commit the crime." State v. Mauricio, 117 N.J. 402, 418-19 (1990). "Among the factors pertinent to this issue are . . . the quantity of intoxicant consumed, the period of time involved, the defendant's ability to recall significant events and his conduct as perceived by others." State v. Johnson, 309 N.J. Super. 237, 266 (App. Div. 1998) (citing State v. Cameron, 104 N.J. 42, 56 (1986)).

We conclude, as did the PCR judge, that defendant's detailed confession to the events leading up to and during the killing, as well as his calculated efforts to conceal the evidence, belie his argument that his faculties were so prostrated that he was incapable of forming the requisite intent. For the same reasons,

A-2979-18

defendant's trial counsel was not ineffective in failing to present a diminished capacity or insanity defense.[4]

## C.

Defendant next contends his trial counsel was ineffective in failing to present a voice identification expert or request a voice identification charge concerning Daniels' identification of him in the lobby. We disagree.

A lay witness can identify the voice of a speaker provided the witness' opinion "(a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. Voice-identification testimony "is generally admissible provided that the witness has an adequate basis for comparison of defendant's voice with the voice which he [or she] identifies as that of the accused." State v. Johnson, 138 N.J. Super. 579, 582 (App. Div. 1976). In this case, Daniels was familiar with defendant, having known him for almost four years. Regardless, Daniels' identification was not solely based on defendant's voice, but also on his stature and eyes, with which she was also familiar. It was for the jury to determine

---

[4] It is clear that "'[i]ntoxication does not, in itself, constitute mental disease' entitling a defendant to raise the defenses of insanity or diminished capacity." State v. Vandeweaghe, 351 N.J. Super. 467, 483 (App. Div. 2002) (quoting N.J.S.A. 2C:2-8(c)).

whether Daniels' voice identification was believable.[5] The jury made that determination.

Likewise, we reject defendant's argument that his trial counsel's failure to request a voice identification instruction was sufficient to establish a prima facie case of ineffective assistance under Strickland. It is true that in State v. Clausell, our Supreme Court said "[t]he constitutional safeguards applicable to visual identification apply equally to voice identifications." 121 N.J. 298, 328 (1990) (citing Johnson, 138 N.J. Super. at 582). In that case, however, the Court held an in-court voice identification was inadmissible because its reliability was outweighed by the suggestiveness of the in-court identification procedure. Id. at 324. Moreover, the totality of the circumstances suggested that the identification was not reliable because the witness only heard the suspect's voice on a single occasion prior to trial. Id. at 329.

Here, unlike the situation in Clausell, there was no in-court voice identification. To the contrary, Daniels' out-of-court voice identification was

_____

[5] Defense counsel also had the opportunity to cross-examine Daniels. That was the proper avenue to undermine the accuracy of her identification. See State v. Garcia, 255 N.J. Super. 459, 466 (App. Div. 1992) ("The primary purpose of cross-examination is to allow a defendant to test the credibility of a witness and the truth of his [or her] testimony. Cross-examination is particularly critical in cases which are founded solely upon the observations of a witness.").

based on her familiarity with defendant's voice, as well as other attributes including his stature and his eyes. Because Daniels' lay opinion was admissible and amply supported by the record, we reject defendant's claim that trial counsel's failure to request a specific voice-identification charge would have changed the outcome of the case. See Strickland, 466 U.S. at 700.

D.

Defendant next asserts that his trial counsel was ineffective in pressuring him not to testify on his own behalf at trial. Defendant argues that his testimony "would have informed the jury that he was heavily intoxicated and therefore lacked the requisite mental state to be guilty of the crimes." Again, we disagree.

Notwithstanding the fact the record contradicts the contention that defendant's faculties were so prostrated that he was incapable of forming the requisite intent, the record reveals that the trial judge conducted an appropriate colloquy with defendant in open court during which defendant knowingly and voluntarily waived his right to testify and, instead, exercised his right to remain silent. The colloquy reads as follows:

> [Court:] Okay, Mr. Parks, you were provided a form, Exhibit C-[two], which is []titled Waiver Not To Testify. Is this your signature on the document?
>
> [Defendant:] Yes, sir.

14

[Court:]   And do you read, write, and understand English?

[Defendant:]  Yes, sir.

[Court:]  And have you had sufficient time to go over this form with your lawyer?

[Defendant:]  Yes, sir.

[Court:]  You understand that by executing this form, you're telling me you're invoking your right not to be a witness or testify in this case; is that correct?

[Defendant:]  Yes, sir.

[Court:]  And is that of your own free will?

[Defendant:]  Yes, sir.

[Court:]  You understand it is your constitutional right to remain silent?

[Defendant:]  Yes, sir.

[Court:]  And that's what you're invoking now?

[Defendant:]  Yes, sir.

[Court:] And you're telling me in the form that when I charge the jury, I should instruct them that . . . they are not to consider for any purpose or in any manner in arriving at their verdict the fact that you did not testify, nor should that fact enter into their deliberations or discussions in any manner at any time.

Further, that you're entitled to have the jury consider all the evidence, and you're entitled to a

15

presumption of innocence even if you do not testify as a witness. And then by signing this form, you're consenting to me giving the charge that I've just outlined to the jury, and the significance of the statement has been explained to you by your attorney. Is all that true?

[Defendant:] Yes, sir.

[Court:] Do you have any questions?

[Defendant:] No, sir.

[Court:] Do you understand once you sit back down and we call the jury back out, you . . . will not be called as a witness?

[Defendant:] Yes, sir.

[Court:] Then I accept this as his knowing, free, voluntary and intelligent choice.

The record clearly highlights that, after being informed of his right to testify on his own behalf and given the opportunity to consult with trial counsel, defendant expressly told the judge that he was waiving his right to testify, and that decision was of his own free will. Like the PCR judge, we conclude that the record in this case amply supports the finding that defendant knowingly and voluntarily waived his right to testify. See State v. Ball, 381 N.J. Super. 545, 557 (App. Div. 2005) (rejecting a Strickland claim where, "regardless of whether defendant was advised by counsel, the trial judge fully explained defendant's

right to testify, the possible consequences of his choice and the option to have the jury instructed to draw no inference from defendant's choice not to testify").

E.

Defendant next argues that his trial counsel was ineffective in failing to advise him of the strengths and weaknesses of his case. In addition, defendant asserts his trial counsel failed to inform him of the potential penal consequences he faced if convicted. We remain unpersuaded.

A defendant's Sixth Amendment right to a fair trial extends to the plea-bargaining process. See State v. Taccetta, 351 N.J. Super. 196, 200 (App. Div. 2002). "Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." State v. Ashley, 443 N.J. Super. 10, 23 (App. Div. 2015) (quoting United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992)).

Our review of the record indicates that defendant was advised of the potential penalties he faced if he insisted on trial and was subsequently found guilty. The pre-trial exchange reads as follows:

> [Court:] Okay. And the maximum sentence . . . it's a life sentence, but the [eighty-five] percent on a life [sentence] comes out to that [sixty-seven] years. The maximum parole ineligibility is [thirty] plus because there's a [thirty]-year period of parole ineligibility. If you're found guilty, the [c]ourt, in its discretion, can

impose a minimum period of confinement before you're eligible[,] which could be up to one-half the sentence, but in this case, you understand that if you're convicted of that first-degree charge, you have to do at least the [thirty]. However, if you were acquitted of that and . . . only found guilty of that second charge, then up to that one half would apply. You understand that?

[Defendant:] Yes, sir.

[Court:] You understand that any sentence that the [c]ourt imposes could be served consecutive to any violation of probation, parole, or other sentence that you're serving, but according to the paperwork, you're not serving probation, parole, or any other charges. Are these your initials on the bottom of [p]age [one]?

[Defendant:] Yes, sir.

[Court:] All right. You understand that the [State has] offered you a plea; [plead] guilty to murder which will be [thirty] years New Jersey state prison. My understanding is that you're rejecting that today. Is that correct?

[Defendant:] Yes, sir.

[Court:] All right. And by rejecting that plea offer, the [c]ourt could impose the more severe sentence that we just discussed up to the maximums, if convicted at trial, which is the life sentence, [eighty-five] percent parole ineligibility, [sixty-seven] years; and you understand that by rejecting the offer today, no further negotiations could . . . take place unless authorized by the presiding judge of the criminal court. Do you understand that?

[Defendant:] Yes, sir.

Contrary to defendant's argument, we conclude that he was fully advised of and understood his sentencing exposure.[6]

## F.

Defendant also contends that his trial counsel should have moved to exclude Daniels' testimony. Defendant claims that Daniels' testimony that she observed him in a ski mask in the building's entrance was unduly prejudicial under N.J.R.E. 403. Because defendant did not raise this issue before the PCR judge, it is not properly before us. "It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)). Neither of these exceptions apply to defendant's argument. This argument, in any event, lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

---

[6] Moreover, we agree with Judge Mega that defendant was made aware of the strengths and weaknesses of the State's case because he was present at the suppression hearing.

Defendant argues that these claims, when taken together, were sufficient to raise a prima facie case of ineffective assistance that warranted an evidentiary hearing. We disagree.

A "[d]efendant must demonstrate a prima facie case for relief before an evidentiary hearing is required, and the court is not obligated to conduct an evidentiary hearing to allow defendant to establish a prima facie case not contained within the allegations in his PCR petition." State v. Bringhurst, 401 N.J. Super. 421, 436-37 (App. Div. 2008). Thus, the decision to proceed without an evidentiary hearing is reviewed for abuse of discretion. State v. Brewster, 429 N.J. Super. 387, 401 (App. Div. 2013).

We conclude that Judge Mega did not abuse his discretion in denying defendant's request for an evidentiary hearing. Even if any of these alleged errors had any merit, which we find they do not, defendant's detailed confession as well as the ample forensic evidence against him do not convince us that but for the alleged errors "the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION